678 S.E.2d 18

In re MARANDA T.

No. 34342.

Supreme Court of Appeals of
West Virginia.

Submitted April 7, 2009.

Decided April 30, 2009.

Jason R. Grubb, Beaver, WV, for the Appellant, Martha T.

Janet C. Williamson, Princeton, WV, Guardian Ad Litem for the Minor Child, Maranda T.

Darrell V. McGraw, Jr., Attorney General, Angela Alexander Ash, Assistant Attorney General, Charleston, WV, for the Appellee, West Virginia Department of Health and Human Resources.

PER CURIAM:

The respondent below and appellant herein, Martha T. (hereinafter "Martha" or "mother"),[1] appeals from an order entered

---

1. "We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of*

April 16, 2008, by the Circuit Court of Mercer County. By that order, the circuit court denied the mother's motion for a dispositional improvement period, terminated her parental rights to her daughter, Maranda T. (hereinafter "Maranda" or "child"), and granted the mother post termination visitation. On appeal to this Court, Martha argues that the circuit court erred in denying her dispositional improvement period and in terminating her parental rights. Based on the parties' arguments, the record designated for our consideration, and the pertinent authorities, we affirm the rulings made by the circuit court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts of this case are undisputed. Maranda was born November 2, 1999, to Martha and Leonard T., Jr. (hereinafter "Leonard" or "father"). When Maranda was seven years of age, Maranda's teacher made a referral concerning Maranda to the Mercer County Department of Health and Human Resources (hereinafter "DHHR"). On January 26, 2007, a worker with Child Protective Services (hereinafter "CPS"), Ms. Akers, traveled to the school and spoke with Maranda. During that interview, Maranda indicated to Ms. Akers that she needed to tell her something. Maranda then turned around, pulled down her pants, bent over, and spread her buttocks apart. Maranda further stated that she was tired of her parents, Martha and Leonard, sleeping with her in her bed and having sex in her presence.

A home visit was conducted January 26, 2007. During that visit, Maranda showed the DHHR employee a box of syringes and made a statement that the pills are also kept in that box. She indicated that the box belonged to her father. A forensic interview of

*Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987) (citations omitted).

**2.** While there is little evidence in the record submitted from the circuit court regarding the other children of Martha and Leonard, it appears that Martha and Leonard have a total of seven children. The record details that Martha and

Maranda occurred on January 31, 2007, during which Maranda indicated that her father touched her "thingy" while pointing to her vagina. Maranda also suggested during this conversation that her father used alcohol and drugs. A safety plan was entered into on January 31, 2007, wherein the mother agreed that "at no time will [Leonard] be allowed in the home with Maranda . . . [that] Maranda [T.] will not be left alone with [Leonard] at anytime. . . ." Further, Martha agreed that failure to comply with this safety plan could result in court action and possible removal of Maranda from her care.

Martha then moved with Maranda out of the home she shared with Leonard and into the home of her parents. A CPS worker with DHHR, Ms. Murphy, visited Martha's parents' home and found it small and extremely cluttered, with dirt and dust over everything. At the time of the visit, the CPS worker noted two men were lying on a bed with Maranda's maternal grandmother, watching television. The CPS worker determined that the home was not an appropriate place for Maranda to live. Martha and Maranda relocated to a shelter in a neighboring county. However, during the second week of their stay at the shelter, Maranda became sick, prompting Martha to move Maranda back into Martha's parents' residence.

On March 7, 2007, the DHHR was granted temporary custody of Maranda as a result of the filing of a child abuse and neglect petition. An adjudicatory hearing was held April 6, 2007. Ms. Murphy and Ms. Akers, both with the DHHR, testified regarding the events leading to the hearing, especially the alleged sexual conduct. Both women also testified that the familial home contained only one bed and that the father always appeared intoxicated. Further, Ms. Murphy testified that Martha and Leonard had relinquished rights to their other children.[2] A

Leonard relinquished their rights to their four older children after the State took custody of them. The DHHR appellate brief explains two other children are deceased: one perished in a house fire and one died after falling from the back of a moving truck when the driver was fleeing from the police. Maranda was the only child remaining in the custody of Martha and Leonard at the time of these proceedings.

truancy officer with the Mercer County Board of Education also testified that Maranda had been absent from school fifty-five days: thirty-five unexcused and twenty excused. Further testimony was provided by Ms. Woodard, who had conducted the forensic interview, regarding Maranda's disclosure of sexually inappropriate conduct by her father.

During the adjudicatory hearing, Martha testified that she had an eighth-grade education and was currently on probation for welfare fraud. She also testified that there are two beds at her place of residence with Leonard, and that he did not drink in front of the children. Martha further stated that she never made love in front of Maranda. Leonard also testified [3] that there are two beds at the home. On the date of the adjudicatory hearing, Maranda was placed in a foster home, and specialized care was imposed because she was found to be developmentally delayed. She was unable to read or write simple words and, during foster care, it was determined that she needed eyeglasses. Maranda also exhibited behaviors such as pulling her arms to her body and walking on her tiptoes, and was either unwilling or unable to dress herself. She also had a tendency to eat until she became sick.[4]

On April 18, 2007, the circuit court entered an order finding Maranda to be a neglected and abused child and that both Martha and Leonard are responsible for such neglect and abuse. The lower court ordered supervised visitation for the mother, but denied visitation for the father because he refused to submit to drug and alcohol tests. On May 11, 2007, and reflected in an order entered May 31, 2007, the mother, Martha, was granted a six-month post adjudicatory improvement period.

On July 6, 2007, a dispositional hearing was held for the father and a review hearing was held on the mother's post adjudicatory improvement period. The father's parental rights were terminated and the lower court set a hearing date of October 5, 2007, to review the mother's post adjudicatory improvement period. During this time, Maranda had supervised visitation with her mother two times per week. It was reported that, during the visits, Martha continued to bring large quantities of junk food, despite being instructed to the contrary, and allowed Maranda to eat whatever amounts she wanted, which caused Maranda to become ill. Martha also failed to take full advantage of the scheduled visitation and left early or cancelled on several occasions.

At the review hearing on October 5, 2007, the guardian ad litem questioned whether reunification with the mother would ever be appropriate. During this review hearing, it was revealed that Maranda had disclosed additional previous sexual misconduct by her father and by other relatives. It was reported that this conduct had occurred when Maranda's mother was present or in an adjacent room watching television. However, it was also stated that Martha continued to cooperate with services and would make some progress, only to revert back to her original skills. Maranda was also scheduled to be tested for an autism spectrum disorder.[5] The lower court extended the mother's post adjudicatory improvement period and set a review hearing for December 21, 2007.

On January 24, 2008, a multidisciplinary team convened. During this meeting, it was revealed that the psychologist who performed the mother's psychological testing and the worker who had been providing parenting and adult life skills classes to Martha now questioned whether she would ever be able to raise a special needs child. They also were concerned with whether Martha would ever be able to generalize the parenting skills that she had been taught.

---

3. The circuit court noted that Leonard appeared to be testifying while intoxicated.

4. During oral argument before this Court, it was reported that most of these behaviors improved during foster care, but that Maranda is still developmentally delayed.

5. According to a doctor's report from April 28, 2008, autism spectrum disorder could not be diagnosed. However, the doctor noted the difficulty in making such a diagnosis in children with a history of abuse and neglect. Maranda was diagnosed with static encephalopathy, developmental coordination disorder, low IQ, adjustment disorder, and attachment disorder.

Subsequently, on February 1, 2008, the lower court held a hearing to review the mother's post adjudicatory improvement period. At this hearing, the lower court recognized that the DHHR was seeking disposition, and ordered services to continue until that time. A hearing was held April 4, 2008, and the DHHR argued that the mother's parental rights should be terminated. At the hearing, the circuit court heard testimony from Cherie Taylor, the testing psychologist, who reported that Martha has a second-grade reading level, which required testing using taped versions, and took several months longer than normal. Ms. Taylor reported that Martha's total intelligence IQ was fifty, and that Martha had limited insight regarding appropriate behaviors and boundaries for children. Further testimony was elicited from Melanie Thompson, who taught parenting and life skills to Martha. Ms. Thompson reported that she had been working with Martha since February 2007, and that the mother's life skills had improved. However, it was testified to that the mother was not able to assimilate her parenting skills. While Martha was able to mimic specific behaviors, she was not able to adapt those behaviors to other situations. Moreover, Ms. Thompson reported that Martha's parenting skills would be consistent for a couple of weeks, then would revert back to her old skill set. The circuit court also heard testimony that the mother had difficulty controlling Maranda during the supervised visits.

During this hearing, CPS testified that Martha submitted a doctor's note suggesting that someone needed to stay with Martha in case of a medical emergency. Martha asked CPS if Maranda's father, Leonard, could be the one to stay with her. The CPS worker opined that this question illustrated the mother's limited insight into the seriousness of the father's sexual abuse of Maranda, and endangered Maranda. The CPS worker ultimately stated that Martha was unable to make consistent improvement to properly care for Maranda. Gail Murano, the caseworker who supervised the visits between Maranda and her mother, also provided testimony. Ms. Murano testified that Martha was unable to be assertive or discipline Maranda during the visits, despite Ms. Murano's attempts to work with Martha on these skills. Ms. Murano further testified that Maranda plays more of a mother role than Martha does, and that Martha was unable to generalize or apply skills from one situation to another. Ms. Murano also stated that the type of long-term services needed to permit safe reunification would be services provided to Martha in the home on a constant basis, twenty-four hours a day, seven days per week. Ms. Murano testified that such services were not available. Martha also testified at this hearing. She stated that Maranda has no conditions or limitations that need to be addressed by a doctor. She also stated that Maranda should not be around her father because he was still drinking, and she did not address or recognize the sexual abuse allegations. DHHR argued that Martha clearly is unable to appreciate or recognize the special needs of Maranda, and would be unable to protect Maranda from sexual abuse because she refused to acknowledge it.

As a result of this testimony and by order entered April 16, 2008, the circuit court found by

> clear and convincing evidence that the respondent mother has attempted to follow the Family Case Plan, but she has limitations, and such limitations will not improve to a point where she could care for the infant child, and the Court concludes that basically the respondent mother would need somebody present in the home to actually fulfill the role of the parent for this child.

Accordingly, the circuit court found that "a dispositional improvement period will not provide any added benefit that has not been realized over the past fourteen (14) months." The order by the circuit court went on to find "no reasonable likelihood that the conditions of neglect can be substantially corrected in the near future, and it is necessary for the welfare of the infant child to terminate the parental, custodial, and guardianship rights of the respondent mother." Thus, the circuit court terminated the mother's parental rights to Maranda and denied a dispositional improvement period, but directed that post

termination visitation should continue.[6] From these rulings, the mother, Martha, appeals to this Court regarding the termination of her parental rights and the denial of a dispositional improvement period.

## II.

### STANDARD OF REVIEW

We previously have explained that, in the realm of an abuse and neglect case,

[a]lthough conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). Mindful of these standards, we proceed to consider the parties' arguments.

6. While a review of the evidence leads this Court to affirm the disposition made by the circuit court, we are troubled by the lower court's order and its lack of statutorily-required information. W. Va.Code § 49–6–5 (2006) (Supp.2008) sets forth specific findings that an order terminating parental rights shall contain. *See* Syl. pt. 4, *In re Edward B.*, 210 W.Va. 621, 558 S.E.2d 620 (2001) ("Where a trial court order terminating parental rights merely declares that there is no reasonable likelihood that a parent can eliminate the conditions of neglect, without explicitly stating factual findings in the order or on the record supporting such conclusion, and fails to state statutory findings required by West Virginia Code § 49–6–5(a)(6) (1998) (Repl. Vol. 2001) on the record or in the order, the order is inadequate. Likewise, where a trial court removes a child from the custody of an allegedly neglectful

## III.

### DISCUSSION

Maranda's mother, Martha, advances two arguments on appeal. She argues that the circuit court erred in denying her motion for a dispositional improvement period and, further, that the circuit court erred in terminating her parental rights. The DHHR responds that the decisions by the circuit court were correct, and asserts that a thorough effort to provide services to this mother was maintained for fourteen months, without benefit. The DHHR continues its argument by alleging that the mother cannot adequately care for her child, even with intensive long-term assistance. The guardian ad litem (hereinafter "guardian") agrees with the circuit court's determinations based on the mother's psychological and emotional limitations. The guardian contends that the evidence shows the mother would need someone in the home to fulfill the parental role and that a dispositional improvement period would not provide any benefit not already realized during the fourteen months of services previously offered.

This Court has previously explained that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Further guidance is provided as follows:

parent and places exclusive custody in another individual, the court must adhere to the mandates of West Virginia Code § 49–6–5(a)(5), and failure to include statutorily required findings in the order or on the record renders the order inadequate."). We have previously allowed an inadequate order terminating parental rights to stand when this Court was convinced, upon a review of the record, that the lower court reached the conclusions required by W. Va.Code § 49–6–5(a)(6) before terminating parental rights. *See In re Jamie Nicole H.*, 205 W.Va. 176, 517 S.E.2d 41 (1999). In the present case, while the order is deficient in regards to the statutorily-required findings, this Court is able to affirm the lower court's rulings based on the record. However, the lower court is henceforth directed to comply with the statutory mandates.

" 'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W. Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W. Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989)." Syllabus Point 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. pt. 7, *In re Katie S., id.* Further, " 'courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. pt. 7, in part, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). While recognizing the substantial rights of Martha, as the natural mother of Maranda, to the custody of her child, this Court must elevate the health and welfare of Maranda above the parental rights of Martha.

■ In the present case before this Court, the lower court found "no reasonable likelihood that the conditions of neglect can be substantially corrected in the near future, and it is necessary for the welfare of the infant child to terminate the parental, custodial, and guardianship rights of the respondent mother." The circuit court's determination was based on the mother's "limitations, and such limitations will not improve to a point where she could care for the infant child[.]" A similar issue regarding parental intellectual capacity was addressed by this Court in the case of *In re Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173 (1999), which states as follows:

Where allegations of neglect are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement.

Syl. pt. 4, *id.*

The parties in the current appeal before this Court agree that *Billy Joe M.* is the controlling case; however, the parties differ as to their interpretations of what constitutes the type of services that would comply with the directives set forth in *Billy Joe M.* Martha argues that, pursuant to *Billy Joe M.*, intensive, in-home services are to be provided before her parental rights can be terminated based on her low intellectual ability. Martha avers that the DHHR personnel only provided the services that they normally provide. She contends that she is entitled to long-term in-house services of a more permanent nature.[7] Thus, Martha urges this Court to adopt a standard of providing long-term in-home services for her so that she can be reunified with Maranda. As alleged by the guardian and the DHHR, any further "services" for this mother that might result in a safe reunification with her child would require a surrogate parent to be in the home twenty-four hours per day. The DHHR and the guardian both propound that such services are impossible to provide and, further, that *Billy Joe M.* does not require such intensive services. We agree with the position set forth by the guardian and the DHHR.

*Billy Joe M.* does not require in-home services such as the type argued by Martha. When a parent's intellectual incapacity is a

---

**7.** During oral argument before this Court, counsel for the mother argued that long-term services might make a difference in her case and provide for a safe reunification with her child. However, while counsel asserted that the mother was entitled to long-term in-home services, he was unable to explain the type of additional services that he sought for his client.

factor in the possible termination of parental rights, *Billy Joe M.* requires that "termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance." Syl. pt. 4, *in part, Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173. Significantly, the case of *Billy Joe M.* involved only allegations of child neglect. The case currently before this Court for consideration involves both neglect and sexual abuse. *Billy Joe M.* anticipated such a case and cautioned that "[w]here the charge is abuse as opposed to neglect, the obligation to provide remedial services is far less substantial." *Id.*, 206 W.Va. at 6 n. 12, 521 S.E.2d at 178 n. 12. The evidence presented to the circuit court alleged that Maranda was sexually abused by her father, and possibly by other male family members. The testimony also indicated that the mother was either present, or in the next room watching television, during these acts. Importantly, the mother's own testimony showed her inability to realize the impact of these allegations, and her request to allow the father back into the home for her own support in case of a medical emergency illustrated her inability to appreciate the gravity of the situation and to protect Maranda from a risk of continued sexual abuse.

The circuit court also heard testimony from the testing psychologist, the guardian, and social service providers to the effect that Martha did not have the ability to retain the skills that were taught to her and, further, did not have the ability to generalize any learned skills and apply them to similar situations. She was only able to mimic skills and apply them in the very narrow context of how she learned them. Such services were offered for fourteen months, without benefit. Thus, the service providers opined that the only way to safely reunite Martha and Maranda would be to place a service provider in the home on a permanent, round the clock, basis. Such services are neither required by *Billy Joe M.* nor would further services benefit a permanent placement finding for Maranda. As acknowledged by *Billy Joe M.*, "the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement." Syl. pt. 4, in part, *Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173. This Court agrees that the services contemplated under *Billy Joe M.* were provided. Unfortunately, despite her sincere attempts, the mother was not able to realize the benefit of these services. Martha had been granted several post adjudicatory improvement periods and received social services for a period of fourteen months. Requiring more services and granting a dispositional improvement period would not only create possible danger to the child, Maranda, but would also serve to thwart a permanent placement for Maranda. Therefore, we affirm the circuit court's termination of Martha's parental rights and further find that the denial of her request for a dispositional improvement period was appropriate.

Finally, we are reminded that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. pt. 1, in part, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). Further evidencing the priority placed on cases involving abused and neglected children, this Court has also stated that "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible." Syl. pt. 5, in part, *id.* Prompt resolution in such cases attempts to protect children from the turmoil associated with the lack of stability in their surroundings and in their caretakers. *See* Syl. pt. 3, in part, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians.").

The record reveals that Maranda's permanency plan was adoption. Maranda was placed in a specialized adoptive home while her mother received social services. The original plan was for Maranda to be adopted by this family in the event reunification with her mother was found to be impossible.

However, during oral argument before this Court, the guardian revealed that Maranda had been removed from the adoptive placement and is currently in specialized foster care, with the plan of addressing adoption after the end of the school year. While it appears that concurrent planning did occur, wherein a permanent placement for Maranda was simultaneously explored in the event reunification proved unsuccessful, the original plan was not able to be brought to fruition. Thus, we urge the fulfillment of the permanency plan to be implemented in accordance with this Court's directives set forth in our prior case law.

As a final note, in the case before the lower court, the circuit court terminated the mother's parental rights, but directed that the mother's visitation with Maranda should continue. *See* Syl. pt. 5, *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995) ("When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the *child's best interest.*"). *At this point in time,* the parties agree that post termination visitation between Maranda and Martha is in the child's best interests. This Court agrees that visitation between the biological mother and child should continue; however, we are mindful that such visitation should not interfere with the need for stability and a permanent placement for the child in this case, should such become an issue.

## IV.

### CONCLUSION

For the foregoing reasons, we affirm the rulings made by the circuit court in its April 16, 2008, order, terminating the mother's pa-

rental rights and denying her motion for a dispositional improvement period.

Affirmed.