695 S.E.2d 910

### In re NELSON B.

### No. 35307.

Supreme Court of Appeals of
West Virginia.

Submitted April 14, 2010.

Decided June 10, 2010.

682

Chaelyn W. Casteel, Esq., Kingwood, WV, for Appellant.

Natalie J. Sal, Esq., Morgantown, WV, Guardian ad litem for Nelson B.

Darrell V. McGraw, Esq., Attorney General, C. Carter Williams, Esq., Assistant Attorney General, Moorefield, WV, for Appellee.

PER CURIAM:

This case is before this Court upon the father Paul B's (hereinafter referred to as Appellant) appeal of a final dispositional order in the Circuit Court of Preston County entered May 15, 2009, which terminated the custodial rights of Paul B. to Nelson B.[1] and placed the child in the custody of the child's maternal aunt and uncle. In this appeal the appellant claims that the circuit court failed to consider a less drastic placement for the child and that it should have returned the child to his custody under supervision of the Department of Health and Human Resources (hereinafter referred to as the "Department".)

The Court has before it the petition for appeal, the designated record and the briefs of counsel. For the reasons set forth below, the circuit court's order is affirmed.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Nelson B. is the child of the appellant Paul B. and his deceased wife, Donna B. Nelson B. was born on August 17, 2002, and was five years of age at the time of the filing of the original abuse and neglect proceeding on May 30, 2008. The petition alleged that Nelson B. was subjected to emotional, psychological and/or physical abuse and neglect by Paul B. and was at risk of imminent danger if left in the home of his father. Specifically, the petition alleged that Paul B. had a chronic history of mental illness and alcohol abuse and had required hospitalization in the past for treatment of these conditions. The petition alleged that Paul B.'s mental illness regularly reached levels where he was not competent to direct his own actions or correctly perceive reality, placing the child at risk.

The petition detailed an incident on May 21, 2008, when Paul B. contacted emergency officials stating that his home had been broken into by a man with a knife. The minor child, Nelson B., was living with his father in this home. Paul B. advised the emergency personnel that the knife-wielding individual was threatening him. Preston County Sheriff's Department deputies responded to the call and soon discerned that Paul B. had been hallucinating and that there was no man threatening Paul B. or his family with a weapon. The Sheriff's personnel contacted the Department to take emergency custody

---

1. We follow our traditional practice in cases involving sensitive facts and use initials rather than surnames to identify the parties. See *In the*  *Matter of Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

of the child. Mental hygiene proceedings were instituted against Paul B., who in turn was admitted to a local psychiatric facility for treatment of his condition.

Because of the appellant's mental condition, both an attorney and a guardian ad litem were appointed for him. The child was likewise appointed a guardian ad litem. The Department was represented by the Preston County Prosecuting Attorney. A CASA[2] representative was likewise involved in this proceeding from its beginning.

At the preliminary hearing, the circuit found that the Department had demonstrated that the circumstances alleged in the petition amounted to imminent danger for the Nelson B. and that there was no reasonable, available or less drastic alternative to removing Nelson B. from the home of his father that would ensure the child's safety. The child was ordered into the legal and physical custody of the Department. Supervised visitation between the father and the child was authorized.

On June 17, 2008, the Department and Paul B. entered into a written stipulation regarding the adjudication of this matter. The circuit court found that Paul B. entered into the stipulated adjudication with the presence of his counsel and his guardian ad litem. Paul B. stipulated and agreed that "he has a chronic history of mental illness and has required hospitalization for these issues in the past. Further, that the Department has provided services to the Respondent Father in the past." The agreed stipulation contained a paragraph indicating that the allegations in the original petition regarding his hallucinations about a gun-carrying intruder were true, and that all of this conduct constituted neglect of the child, Nelson B. The parties agreed that it was contrary to the child's best interests to be placed in the home of Paul B.

As part of the stipulation, Paul B. moved for, and was granted, a six-month post-adjudicatory improvement period pursuant to West Virginia Code § 49–6–12(b) (1996) (Repl. Vol. 2009)[3] As part of this post-adjudicatory improvement period and pursuant to the Family Case Plan specifically developed for this family, Paul B. was required to continue all services at Valley Mental Health Services; participate in weekly supervised visits with Nelson B., and make daily telephone calls to the child; participate in individual counseling, if deemed necessary; cooperate with in-home services; take all medications; and cooperate with the multi-disciplinary team.

The course of Paul B.'s improvement period was regularly monitored by the circuit

---

2. CASA stands for Court Appointed Special Advocate. The role and duties of the CASA are defined in Rule 52 of the Rules of Procedure for Child Abuse and Neglect Proceedings. The CASA's primary role is "to further the best interests of the child until further order of the court or until permanent placement of the child is achieved."

3. West Virginia Code § 49–6–12(b) states:
   After finding that a child is an abused or neglected child pursuant to section two of this article, a court may grant a respondent an improvement period of a period not to exceed six months when:
   (1) The respondent files a written motion requesting the improvement period;
   (2) The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period and the court further makes a finding, on the record, of the terms of the improvement period;
   (3) In the order granting the improvement period, the court (A) orders that a hearing be held to review the matter within sixty days of the granting of the improvement period, or (B) orders that a hearing be held to review the matter within ninety days of the granting of the improvement period and that the department submit a report as to the respondent's progress in the improvement period within sixty days of the order granting the improvement period;
   (4) Since the initiation of the proceeding, the respondent has not previously been granted any improvement period or the respondent demonstrates that since the initial improvement period, the respondent has experienced a substantial change in circumstances. Further, the respondent shall demonstrate that due to that change in circumstances the respondent is likely to fully participate in a further improvement period; and
   (5) The order granting the improvement period requires the department to prepare and submit to the court an individualized family case plan in accordance with the provisions of section three, article six-d of this chapter.

court, the multi-disciplinary team, the Department, the CASA representative, Paul B's counsel and guardian ad litem, as well as the child's guardian ad litem. Because of a waiting list, Paul B.'s individual counseling did not commence at the start of the improvement period. Furthermore, Paul B. continued to experience periods where he sought inpatient treatment for his mental health issues. As a result of these hospitalizations, Paul B. missed visitations with the child.

Part of Paul B.'s Family Case Plan focused on the need for regular employment and a steady income, as the family's sole source of income was Social Security survivor benefits occasioned from the death of Nelson B.'s mother. At times during the improvement period, Paul B. indicated his intention to seek Social Security Disability benefits in his own name. Caseworkers continued to suggest that Paul B. seek employment with a sheltered workshop. Paul B. did not follow through with these suggestions.

In its dispositional order entered on May 15, 2009, and based upon a hearing held February 19, 2009, the circuit court concluded that despite the best efforts of Paul B. and the Department, Paul B. was presently unable to adequately care for Nelson B.'s needs. The circuit court further concluded that it was not in the best interest of the child for Paul B.'s parental rights to be terminated, but that a permanent placement of Nelson B. was possible by way of a legal guardianship with the maternal aunt and uncle. Continued contact and visitation between Nelson B. and Paul B. was specifically authorized. The court's order clearly left the matter of modification open, by stating as follows:

> The Court is not terminating parental rights, and is further issuing this Order without prejudice so as to permit the Respondent Paul B. to later file a petition with this Court seeking return of custody of Nelson B. if the circumstances are appropriate for the same.

The final order further contemplated increased visitation and a greater role for Paul B. in Nelson B.'s life by ordering that:

> "[A]s the child gets older, the parties should attempt to increase the contact be-

tween the child and Respondent Paul B., and shall permit unsupervised visitation when the same becomes safe and appropriate given the child's age and mental health status of Paul B."

The lower court reviewed the permanency placement of Nelson B. on May 15, 2009. By separate order entered June 4, 2009, the circuit court ordered that Nelson B. remain in the legal and physical custody of the Department for continued placement with his maternal aunt and uncle. The order references the permanency plan of legal guardianship with the child's maternal aunt and uncle but this order does not appear to establish the guardianship. A careful review of the appellate record indicates that on May 12, 2009, a petition for legal guardianship was filed by the maternal aunt and uncle, but no final action has been taken on that petition.

## II.

### STANDARD OF REVIEW

As set forth above, Paul B. appeals the ruling affecting his parental rights to Nelson B., placing the child with his maternal aunt and uncle and continuing regular visitation with the child. "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

With these standards in mind, we now consider the arguments of the parties.

## III.

## DISCUSSION

■ We begin our analysis with the understanding that our law strongly favors the rights of the parent to raise his or her children.

" ' "A parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts."

Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969)' Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975)." Syl. Pt. 1, *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987).

■ We have previously held:

"As a general rule the least restrictive alternative regarding parental rights to custody of a child under W. Va.Code, 49–6–5 (1977) will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements."

Syl. pt. 1, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

■ We have likewise held that in some instances, there is no other remedy short of termination of parental rights when there is no reasonable likelihood that the parenting deficiencies or abuse cannot be substantially corrected.

"Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va.Code, 49–6–5 (1977) may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va.Code, 49–6–5(b) (1977) that conditions of neglect or abuse can be substantially corrected."

Syl. pt. 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

■ West Virginia Code § 49–6–5(a) (1996) (Repl.Vol.2009) addresses situations similar to the one faced by the court below in the case *sub judice* by creating a list of possible dispositions, in order of precedence. The potential dispositions include the following: dismissal of the petition; referral of the child and family to community agencies for needed assistance; as well as return of the child to his or her own home under the supervision of the Department. When, however, it is determined that the conditions that gave rise to the removal of the child from the home cannot be remedied, West Virginia Code § 49–6–5(a)(6) (2009) states:

Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency. The court may award sole custody of the child to a non-abusing battered parent. If the court shall so find, then in fixing its dispositional order the court shall consider the following factors: (A) The child's need for continuity of care and caretakers; (B) the amount of time required for the child to be integrated into a stable and permanent home environment; and (C) other factors as the court considers necessary and proper. Notwithstanding any other provision of this article,

the court shall give consideration to the wishes of a child fourteen years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights. No adoption of a child shall take place until all proceedings for termination of parental rights under this article and appeals thereof are final. In determining whether or not parental rights should be terminated, the court shall consider the efforts made by the department to provide remedial and reunification services to the parent. The court order shall state: (i) That continuation in the home is not in the best interest of the child and why; (ii) why reunification is not in the best interests of the child; (iii) whether or not the department made reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family, or some portion thereof, and to prevent the placement or to eliminate the need for removing the child from the child's home and to make it possible for the child to safely return home, or that the emergency situation made such efforts unreasonable or impossible; and (iv) whether or not the department made reasonable efforts to preserve and reunify the family, or some portion thereof, including a description of what efforts were made or that such efforts were unreasonable due to specific circumstances.

Further, W. Va.Code § 49–6–5(b)(6) provides a definition for the phrase "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected." The applicable code section states:

(b) As used in this section, "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" shall mean that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help. Such conditions shall be considered to exist in the following circumstances, which shall not be exclusive:

. . .

(6) The abusing parent or parents have incurred emotional illness, mental illness

or mental deficiency of such duration or nature as to render such parent or parents incapable of exercising proper parenting skills or sufficiently improving the adequacy of such skills

. . .

After applying the statutory language to the facts that faced the circuit court, we find that the Department exercised reasonable efforts to reunify Nelson B. with his father. Through a tailored improvement period and with the collaborative effort of many entities, the Department attempted to give Paul B. the ability to be a fit and proper parent to his young son. The course of his mental illness, however, was such that Paul B. continued through the improvement period, to suffer periods of time where he was unable to adequately provide for his young son's needs. In his appeal to this Court, Paul B. encourages us to continue to speculate as to whether he will ever be able to make a home for his child. This case is especially difficult because it is clear that Paul B. loves his son, that the child is bonded to his father and that Paul B. undertook tremendous steps and made some gains during the course of his improvement period. However, despite these efforts by Paul B., as well as the efforts of the Department to reunify this family, Paul B.'s mental illness is such that it appears impossible to safely return Nelson B. to the care of his father. During the course of this improvement period and indeed prior to the filing of the petition that led to this appeal, the Department sought to assist Paul B. with intensive, in-home parent education and other services. Despite these services, and Paul B.'s hard work to become a safe and suitable parent for his child, Paul B. could not provide a stable home, a stable income or stable transportation. He continued to suffer from the manifestations of a severe and chronic mental illness that from time-to-time required hospitalization. When these events occur, the health, safety and welfare of Nelson B. is certainly adversely impacted.

We believe that the circuit court placed the child in an appropriate permanent placement with his maternal aunt and uncle. The home where the child was placed is a familiar home

to this child, inasmuch as Paul B. and Nelson B. resided there at some points in their lives together. And while this is a final placement under our statutory scheme, it appears that Paul B. has been given an extraordinary opportunity to remain active in his child's life despite the limitations on parenting caused by his mental illness, by having regular, meaningful contact with the child, including the chance to increase the time spent with the child. As the guardian ad litem opined in her brief to this Court, "this solution is clearly in the best interest of Nelson B., and is (sic) frankly is probably in the best interest of Paul B."

The circuit court could have decided this case much differently and perhaps terminated Paul B.'s parental rights. In the case of *In re Maranda T.*, 223 W.Va. 512, 678 S.E.2d 18 (2009), this Court affirmed the termination of the parental rights of a mother who suffered from low intellectual functioning. In *Maranda T.*, the mother attempted to abide by the plan proposed during an improvement period, but because of her intellectual limitations was unable to get to a point of being able to care for her child. In that case, unlike the case before the court today, the mother's parental rights were terminated, with post-termination visitation between the parent and the child ordered. The mother in *Maranda T.* was given approximately 14 months of services before the court terminated her parental rights; in the present case, counting the Department's efforts before the formal petition was filed, Paul B. has received in excess of 21 months of services.[4] The lower court employed a lesser-restrictive alternative and left Paul B. in a position to increase his role and involvement in Nelson B.'s life.

After carefully reviewing the evidence presented, the record and the briefs of the parties, we conclude that the circuit court did not err in determining that Paul B. was unable to adequately parent his child. Although significant efforts were put forth by Paul B., and these efforts continue to date,[5] he is currently unable to provide the type of home that his young son requires. As such, the circuit court correctly made the difficult decision to end the custodial parental relationship, while maintaining regular and meaningful contact between the child and his biological father. And because the circuit court declined to terminate the parental rights, if Paul B. were to show significant improvement in the conditions which gave rise to this proceeding, his role in the child's life could be modified.

We are concerned that the permanency plan formulated by the Department has yet to be concluded, depriving Nelson B. of the finality of his placement. While the child's caretakers have filed a petition for infant guardianship in the Circuit Court of Preston County, no discernable action has been taken. Thus, the child remains in the legal and physical custody of the Department, with placement in the home of fit and proper persons willing and able to solidify their relationship with the child through a legal guardianship. The child deserves the finality and permanency of a legal guardianship, and the circuit court should promptly act on the petition now that this appeal has concluded.

## IV.

### CONCLUSION

Accordingly, for the reasons set forth above, the dispositional order of the Circuit

---

**4.** This Court recognizes that the facts in *Maranda T.* were more egregious than the present facts. For instance, the child in *Maranda T.* had been subjected to substance abuse and sexual abuse misconduct by one or more caretakers. Further, the fact that Maranda T. was a special needs child, coupled with the mother's intellectual limitations, the mother's failure to fully appreciate the offered services, and the mother's inability to acknowledge the abuse that had been perpetrated on her daughter, left this Court with the conclusion that the mother had an inability to

protect or care for her child. Thus, under the facts of that case, termination was appropriate.

**5.** In a pleading entitled "Update to Brief for Petition to Appeal," Paul B. advised the Court that he had obtained employment at the local sheltered workshop and had obtained housing in Kingwood Apartments. We applaud the continued efforts of the appellant to better his situation. These recent events, however, do not change the conclusion reached by this Court.

Court of Preston County entered on May 15, 2009, is affirmed.

**Affirmed.**