**FILED**

**May 20, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **E.G.**

**No. 21-0274** (Harrison County 19-JA-191-1)

### MEMORANDUM DECISION

The petitioner mother J.B. appeals the Circuit Court of Harrison County's February 4, 2021, dispositional order terminating her parental, custodial, and guardianship rights to child E.G.[1] She asserts the circuit court erred in finding no reasonable likelihood she could substantially correct the conditions of neglect, and by failing to impose a less-restrictive dispositional alternative. The respondent West Virginia Department of Health and Human Resources ("DHHR") and the child's guardian *ad litem* argue in support of the circuit court's dispositional order.[2]

After considering the parties' written and oral arguments, as well as the record on appeal and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's dispositional order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

### I. Factual and Procedural Background

The petitioner is the birth mother of E.G. In October 2019, when E.G. was one week old, the DHHR filed an abuse and neglect petition against the petitioner and E.G.'s father. According to the petition, hospital staff who cared for the petitioner and E.G. after E.G.'s birth were concerned that the infant was in imminent danger. Nurses had observed several instances where the parents failed to properly and safely care for E.G. while in the hospital. This included three separate instances of not rendering assistance to the baby when she spit up and began to choke, repeatedly co-sleeping with the baby despite having been told the baby could be suffocated, covering the baby's face with a blanket while the baby was co-sleeping with the petitioner, feeding the baby improper amounts of formula at improper intervals, pulling off the newborn baby's umbilical cord,

---

[1] Because the case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the parties. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n. 1 (1990); *In re K.H.*, 235 W. Va. 254, 256 n. 1, 773 S.E.2d 20, 22 n. 1 (2015).

[2] The petitioner is represented by Dreama D. Sinkkanen, Esquire. The respondent DHHR is represented by Attorney General Patrick Morrisey, Deputy Attorney General Steven R. Compton, and Assistant Attorney General Brittany N. Ryers-Hindbaugh. The child's guardian *ad litem* is Jenna L. Robey, Esquire.

and the inability to perform simple tasks necessary for a baby's care. The nurses had to continually re-educate the petitioner about how to care for E.G., but their attempts at education were unsuccessful. The abuse and neglect petition alleged that both parents are "low functioning and have mental health diagnoses and lack the capacity to care for the child[.]" Furthermore, the petitioner planned to take the baby to live with the father's family in an overcrowded home where about a dozen people were already living. There was also a report of domestic violence between the petitioner and the baby's father, and an allegation that the baby's father was addicted to drugs. The DHHR had attempted to implement a safety plan before resorting to an abuse and neglect petition, but it could not find an appropriate caregiver.

When E.G. was discharged from the hospital, she was immediately placed in foster care. The petitioner waived her right to a preliminary hearing. Each parent was appointed both a lawyer and a guardian *ad litem*, and a guardian *ad litem* was appointed for E.G.

In November 2019, the petitioner underwent a parental fitness examination. The evaluating psychologist found that the petitioner's thinking showed evidence of impulsivity and a lack of control over her emotions; her thoughts were disorganized; and her speech was illogical and irrational. The petitioner's intellectual functioning fell within the lower extreme range. The petitioner scored in the high-risk range for lacking nurturing skills and the inability to handle parenting stresses, and for lacking an understanding of normal child growth and development. The psychologist opined that "[d]ue to significant intellectual limitations and given her lack of appreciation for the severity of her child's [] needs, [the petitioner] may not have the capacity to understand basic child-rearing practices" and "currently does not have the parental capacity to care, protect and change in order to provide adequately for the child."

An adjudicatory hearing was held on December 2, 2019. Relying upon the reports of the hospital staff and the findings in the petitioner's forensic psychological evaluation, the circuit court adjudicated the petitioner as neglectful.[3] On January 27, 2020, the petitioner was granted a post-adjudicatory improvement period. On July 27, 2020, the court extended her improvement period

---

[3] West Virginia Code § 49-1-201 (2018) defines "Neglected child" to include

> a child . . . [w]hose physical or mental health is harmed or threated by a present refusal, failure or inability of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent, guardian, or custodian[.]

This same statute defines "Abusing parent" to encompass a parent who has committed either abuse or neglect: "'Abusing parent' means a parent, guardian, or other custodian, regardless of his or her age, whose conduct has been adjudicated by the court to constitute child abuse or neglect as alleged in the petition charging child abuse or neglect." *Id.*

by three months. During her improvement period, the petitioner was provided extensive services including adult life skills classes, parenting classes, and supervised visitation.[4]

During the improvement period, it was discovered that E.G. is blind because her optic nerves did not properly form. The child requires auditory stimulation and special services. E.G. also has developmental delays and a pituitary gland problem that require monitoring of her health and growth. She sees several medical providers and therapists.

In November 2020, the petitioner was re-evaluated by the same psychologist. According to the updated forensic evaluation report, the petitioner tested at high risk in three out of five categories, which was worse than during the initial evaluation. Specifically, the evaluator found that she was at high risk for a lack of nurturing skills and inability to handle parenting stressors, a lack of understanding of normal child growth and development, and in using children to meet her own needs. Even though the petitioner had received services for approximately one year, the psychologist concluded that the petitioner's prognosis was poor and she still lacked the capacity to care, protect, and change in order to adequately provide for the child.

The dispositional hearing was held over two days in December 2020 and January 2021. The DHHR presented evidence that although the petitioner attended most of the adult life skills and parenting classes offered to her, she failed to make any progress. The service providers testified that they modified their lessons to match the petitioner's intellectual abilities, but she did not retain the information. The petitioner was also permitted to take notes and use her notes when being evaluated on various skills, with no success. The forensic psychologist did not know of any other services that could be provided to assist the petitioner to improve.

Furthermore, the petitioner was repeatedly reminded that E.G. is blind, but the petitioner did not acknowledge, or seem to understand, the child's disability or need for special assistance. The petitioner repeatedly asked her service providers if the child "really is blind," and she expressed her belief that the child would one day be able to drive a car. During her November 2020 re-evaluation, the petitioner informed the psychologist that strong eyeglasses could help the minor child to see, even though the petitioner had been told that eyeglasses would not help. The petitioner also failed to interact verbally with E.G. for the first seven months of her supervised visitation, despite being told of the importance of verbal interaction with a child who is blind. Instead, the petitioner attempted to show the child games on her cellular phone and events outside the window. When her visits were temporarily changed to video visits due to the COVID-19 shutdown, the petitioner failed to interact with the child during the calls.

The evidence at the dispositional hearing also revealed that during her supervised visits with E.G., the petitioner had to be reminded to feed, but not overfeed, the baby, and to change her diapers. She missed four visits with the child after November 2020. At the time of the dispositional hearing, the petitioner was not employed and did not have stable housing. None of her service providers could confirm the address where the petitioner actually lived or who else resided in the

---

[4] E.G.'s father was also adjudicated for neglect and was granted a post-adjudicatory improvement period. In addition to the issues discussed with respect to the petitioner, the father had failed drug screens.

home. The providers reported that when they did enter a home to work with the petitioner, they were concerned about the cluttered conditions they found. Finally, some of the service providers raised concerns regarding domestic violence involving the petitioner.

The father briefly testified during the dispositional hearing, but the petitioner did not testify or put on any evidence. The petitioner also did not request any alternate disposition, such as the termination of her custodial rights only.

In reaching its dispositional decision, the circuit court noted that E.G.'s special needs require extensive appointments with medical specialists, in addition to her regular pediatric appointments. Further, the court cited testimony from a specialist with the Birth to Three program who explained that the child's caretaker should constantly engage verbally with the child due to her blindness in an effort to help her "learn to interact and participate in the world." This specialist also indicated that the child's caregivers would need to be able to retain information regarding the child's various conditions and how to treat them, in addition to needing to learn Braille. The court found that despite the DHHR "offering every available service" to the petitioner, she failed to make substantial improvements. In fact, the court found that she failed to accomplish any of the goals of the improvement period. Further, "[n]ot a single service provider . . . who . . . worked with the family for over a year" believed that the petitioner could properly care for the child without outside help.

After considering the evidence, the circuit court found that there was no reasonable likelihood the petitioner could substantially correct the conditions of neglect in the near future and that the child's welfare required termination of the petitioner's rights. West Virginia Code § 49-4-604(c)(6) (2020) directs that a court shall, "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent[.]" Accordingly, the court terminated the petitioner's parental, custodial, and guardianship rights.[5] The petitioner appeals this dispositional order.

## II. Standard of Review

The Court has previously established the following standard of review for abuse and neglect cases:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided

---

[5] All of E.G.'s father's rights were also terminated.

the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). With this in mind, we consider the petitioner's assignments of error.

### III. Discussion

The petitioner asserts two related assignments of error, both of which pertain to the circuit court's decision to involuntarily terminate all of her rights to E.G. at disposition.

In her first assignment of error, the petitioner argues that because she fully participated in her improvement period, the circuit court erred in finding there was no reasonable likelihood she could substantially correct the conditions of neglect in the near future. Importantly, however, the petitioner does not challenge the circuit court's many findings regarding her failure to make any actual improvement during her improvement period. Pursuant to West Virginia Code § 49-4-604(d), "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing [parent has] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." The evidence overwhelmingly supports the circuit court's findings. The petitioner struggled with basic caretaking for the child prior to removal, and she continued to demonstrate an inability to care for the child after receiving services for an entire year.[6]

It is evident that the petitioner's inability to improve stems, at least in part, from her intellectual disabilities. In this regard, we have held that

> "[w]here allegations of neglect are made against parents based on [the] intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement." Syllabus point 4, *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999).

Syl. Pt. 4, *In re Maranda T.*, 223 W. Va. 512, 678 S.E.2d 18 (2009). The record shows that the petitioner was given extensive services tailored to her abilities but was unable to improve. The

---

[6] On appeal, the petitioner claims that she has made recent improvements including separating from E.G.'s father and obtaining her own home independent from the father's family. However, this evidence was not presented during the dispositional hearing and is not in the record on appeal. And, even if these claims are true, they do not obviate the petitioner's demonstrated intellectual disabilities or show that she is capable of caring for E.G.

evidence aptly demonstrates that the petitioner cannot adequately care for E.G. even with the benefit of intensive long-term assistance.

The circuit court's decision to terminate parental rights is bolstered by the child's special needs and the fact that the child will require additional care and treatment that the petitioner is unable to provide. This Court has held that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). Given that the petitioner's only argument is that she participated in her improvement period, not that she improved sufficiently to care for the child, she is entitled to no relief on appeal.

In her second assignment of error, the petitioner asserts that the circuit court erred by failing to impose a less-restrictive dispositional alternative than the full termination of her parental rights.[7] According to the petitioner, the court could have terminated only her custodial and guardianship rights, and E.G. could have been placed in a legal guardianship with the paternal grandparents. The petitioner argues that this would have permitted her to have continued contact with E.G. because E.G. deserves the opportunity to have a close, loving relationship with her mother.

As a threshold matter, the appendix record on appeal does not include any evidence that the paternal grandparents are suitable or approved for placement. Indeed, the paternal grandmother has filed a separate appeal to this Court challenging the circuit court's post-termination order refusing to place E.G. into her care due to unsuitability. Regardless, the circuit court's decision to terminate all of the petitioner's rights is supported by the overwhelming evidence that the petitioner simply cannot provide for, or comprehend, the child's extensive needs. We note that

> "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 4. The petitioner's argument is a reiteration of her assertion that there was no evidence to support a finding that termination was necessary for the child's welfare, an argument that we have already rejected.

To the extent that, in her second assignment of error, the petitioner contends she should have received post-termination contact with E.G., we disagree. First, the petitioner fails to cite anywhere in the record where she asked the circuit court to award her post-termination visitation. Second, when deciding whether to grant post-termination visitation, "[a]mong other things, the circuit court should consider whether a close emotional bond has been established between parent

---

[7] *See* W. Va. Code § 49-4-604(c) (specifying options court may impose at disposition).

and child . . . . The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syl. Pt. 5, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995). The petitioner points to no evidence in the record to support her claim that she has a bond with E.G. To the contrary, the record shows that the child was removed from the petitioner's care a few days after birth and was only one-year old at the time of the dispositional hearing. Furthermore, during the first several months of her supervised visits, the petitioner failed to verbally engage with the child—even though she was repeatedly advised that auditory communication is necessary to interact with a blind child.

For the reasons set forth herein, we find no error in the termination of the petitioner's parental, guardianship, and custodial rights. The circuit court's February 4, 2021, dispositional order is affirmed.

Affirmed

**ISSUED:** May 20, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton

**NOT PARTICIPATING:**

Justice C. Haley Bunn