521 S.E.2d 173

**In re BILLY JOE M. and Jason M.**

**No. 25888.**

Supreme Court of Appeals of
West Virginia.

Submitted June 1, 1999.

Decided July 15, 1999.

**2**

Cynthia A. Stanton, Esq., Summersville, for Brenda & Hubbard M.

Katherine M. Mason, Esq., Assistant Attorney General, Pineville, for Department of Health and Human Resources.

Harley E. Stollings, Esq., Summersville, Guardian Ad Litem for Billy Joe & Jason.

Dwayne C. Vandevender, Esq., Assistant Prosecuting Attorney, Webster Springs, for Department of Health and Human Resources.

WORKMAN, Justice:

This is an appeal by Brenda and Hubbard M.[1] (hereinafter "Appellants") from an order of the Circuit Court of Nicholas County ter-

---

1. We follow our traditional practice in cases in- volving sensitive facts and use only initials to

minating their parental rights to their two sons, Billy Joe M. and Jason M.,[2] currently ages eleven and twelve, respectively, and denying post-termination visitation rights. The Appellants contend that denial of visitation is not in the best interests of the children. They do not, however, appeal the termination of parental rights. We reverse and remand for implementation of permanency plans[3] and additional evaluation regarding the potential for successful post-termination visitation, both after the permanency plans are implemented and in the interim.

## I. Facts

The Appellants are the natural parents of three sons.[4] On August 14, 1998, emergency petitions for the custody of Billy Joe and Jason were filed in the Circuit Court of Nicholas County by Mr. Mark Abbot, a child protective services worker for the West Virginia Department of Health and Human Resources (hereinafter "DHHR").[5] Subsequent to an October 13, 1998, adjudicatory hearing, the lower court ruled, by order dated October 29, 1998, that Billy Joe and Jason were abused and/or neglected children.[6] The lower court found the following conditions in existence at the time of the filing of the August 1998 petition in Nicholas County: garbage including rotten food scattered through the house; animal urination and defecation in the house; matted hair and dirty clothing on the children; children eating from garbage cans; inability of the children to perform basic hygiene; and Billy Joe's ear compacted with foreign items including toe nails, plastic, and sand. Billy Joe also vomited in the car of a transportation provider for DHHR, and his vomit contained sticks, pine needles, and cotton balls. In its October 29, 1998, order, the lower court pro-

identify the parties rather than their full names. *See In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989). Mr. M. is presently sixty-one years of age, functioning at approximately the fourth percentile for IQ scores in the United States, with a fourth grade education. His employment has reportedly been very sporadic. Mrs. M is forty-two years of age, with a second-grade education and no history of employment. She functions at approximately the first percentile for IQ scores in the United States.

2. Billy Joe was born on October 14, 1987, and Jason was born on July 24, 1986. Both children have been diagnosed as mildly mentally retarded.

3. The case plans for both Billy Joe and Jason indicate the need for specialized foster care pending attempted adoptive placement.

4. Allegations of abuse and neglect, in the form of inadequate supervision of the children and maintenance of their physical surroundings, had previously been filed in Braxton County in February 1994, and the children were removed from the parental home from March 1994 through June 1995. Subsequent to improvement periods, Billy Joe and Jason were returned to their parents' care in June 1995. The parents repeatedly cleaned their home in an attempt to regain custody of the children but would then permit the same unsanitary conditions to reoccur. The children were again removed in August 1995 and returned in January 1996. Parental rights to the youngest son, James, were terminated by the Circuit Court of Braxton County on August 14, 1998. James is not a subject of this appeal from the Nicholas County order. As noted by the

lower court, the Braxton County Circuit Court provided little reasoning for permitting Billy Joe and Jason to return to their parents, while terminating the parental rights to the youngest son, James, explaining only that the older children were more capable of caring for themselves.

5. The petition asserted that the West Virginia DHHR has an extensive history with the family, beginning in Jefferson County on December 15, 1986, at the time Jason was five months of age and services were opened for child protective services to monitor neglect issues. The petition indicated that Action Youth Care had provided basic needs assistance, parenting skills, family preservation services, hygiene and housekeeping skills and access to community resources in Jefferson County from February 1992 through August 1993. Braxton County DHHR initiated family services in August 1993 when the family moved to Braxton County, providing parenting, budgeting, nutritional counseling, grocery shopping supervision, and basic child care training. Well Spring Family Services provided assistance in Nicholas County from August 1994 through November 1996.

6. The lower court found that the Braxton County DHHR had provided services to this family prior to the 1995 petition filed in Braxton County. The lower court recounted the myriad of services provided to this family in Braxton County, including parent training, budgeting skills training, grocery shopping, homemaking, hygiene, basic child care, in-home services from Florence Crittenton Center, and in-home services from the Daily Living organization.

vided that the possibility of visitation between the parents and the children was to be evaluated by the DHHR, and a dispositional hearing was scheduled for December 4, 1998. The lower court further found that the health and well-being of the children would be endangered by permitting them to return to their parents' home.

During the December 4, 1998, hearing, the lower court received the testimony of Mr. Mark Abbott, the child protective services worker assigned to this case in Nicholas County. Mr. Abbott testified regarding the children's behavior problems and acting out in the foster home. According to Mr. Abbott's testimony, the children urinated in trash cans, behind closed doors, and in hampers. Mr. Abbott indicated that the children spat on the walls during their first few weeks in foster care and that one of the children saved his feces in a can. The children also destroyed property at their foster home, including video tapes and a garden. Jason reported suicidal thoughts, and Billy Joe reported homicidal thoughts. Each child was eventually placed, separately, in in-patient psychiatric care.[7]

Ms. Nancy Conner, a child protective services worker in Nicholas County, also testified that visitations between the parents and children had caused the children to behave in a negative manner. Ms. Conner testified that in her opinion, visitation with the parents was not in the best interests of the children and would impede the progress of the children.

Ms. Patty Salisbury, a child protective services worker assigned to the case in Braxton County and continuing to work with the family in Nicholas County, testified concerning the effects of monthly parental visitation, occurring during the period the children were removed from the home in Braxton County. She explained that the children's behavior in foster care was "uncontrollable" for two or three days after parental visitation. Ms. Salisbury indicated that the children would become emotionally upset, cry, withdraw, and engage in acting out behaviors such as damaging objects after visiting with their parents. Ms. Salisbury explained that the children were confused about seeing their parents and then being separated from them again. The confusion, according to Ms. Salisbury, manifested itself by disruption of school patterns, poor interaction with foster parents and other children in the home, and destruction of property by hitting or kicking walls or breaking things.

Dr. Stephen O'Keefe, Ph.D., a licensed psychologist, also testified during the December 4, 1998, hearing. Dr. O'Keefe had evaluated the children in 1994 and had listened to the testimony in the courtroom on December 4, 1998. Based upon the testimony in that December 4, 1998, hearing, Dr. O'Keefe opined that any contact with the parents at that time would be detrimental to the children's transition into foster care and potential adoptive placement. He testified that the problems the children appeared to be experiencing in 1998 were identical to those he had encountered with the children during his 1994 examination, in which he had found that each child was "mildly retarded" and was suffering from "attention deficit disorder." Dr. O'Keefe further opined that whether or not post-termination visitation was appropriate depended upon whether the children were to be adopted. If adoption was a real possibility, he indicated that he would not be opposed to post-adoption visitation but would oppose visitation pending adoption. If the permanency plan for the children was permanent foster care, Dr. O'Keefe indicated that he would not be opposed to visitation and that specialized care would be capable of managing the children's reactive behaviors arising from visitation with their parents.

The lower court subsequently entered an order, dated December 29, 1998, terminating

---

7. Jason was placed in HCA Riverpark Hospital, and Billy Joe was placed in Highland Hospital in Charleston. Jason had been hospitalized based upon suicide threats, threatening to jump off a moving school bus, and threatening to jump off a high porch at his foster parents' home. Upon learning of Jason's hospitalization, Billy Joe became distraught, informed his foster parents that he was running away, and rode a bicycle down the middle of a highway. After discharge, both boys were placed in specialized foster homes through Action Youth Care in Wayne County.

the parental rights of the parents [8] to Billy Joe and Jason and indicating that visitation was not in the best interests of the children and should not take place "at this time." The court further indicated that "the possibility of visitation for the infants and their parents" would be addressed during a custody review hearing scheduled for March 1, 1999.[9] The Petition for Appeal to this Court was thereafter filed.

The Appellants do not appeal the adjudication of neglect or the termination of parental rights. Their sole issue on appeal is the lower court's denial of post-termination visitation. The Appellants maintain that the close parent-child emotional bond compels the conclusion that post-termination visitation is warranted. The DHHR contends, however, that post-termination visitation is not in the best interests of the children and would in fact be detrimental to them. The DHHR maintains that the lower court properly recognized the emotional bond between the parents and the children, as well as the fact that the children desired to reside with their parents, but concluded, based upon the testimony of Dr. O'Keefe and Mr. Abbott, that post-termination visitation would be detrimental to the children and would not be in their best interests at the time of the hearing on December 4, 1998. The lower court did not, however, exclude the possibility of future visitation.

## II. Standard of Review

 We have expressed our applicable standard of review in abuse and neglect cases as follows:

Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

## III. Post-termination Visitation

 This Court has previously acknowledged that post-termination visitation [10] may be appropriate under certain circumstances and has explained as follows:

When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other

---

8. The lower court found that there was no reasonable likelihood that the parents could substantially correct the existing conditions of neglect, based upon (1) the fact that the parents suffered from "mental deficiency of such duration as to render... [them] incapable of exercising *proper parenting skills or sufficiency improving* the adequacy of such skills;" (2) the long history of services offered to the family, resulting in little or no improvement. The lower court recounted the services offered since 1994 through the DHHR, Florence Crittenton Center, Action Youth Care, and counseling with Seneca Mental Health and Health Transitions; and (3) the mental deficiencies of the parents as reflected in multiple psychological evaluations finding both parents functioning with IQs in the low 60s, with little ability to handle the financial affairs or the child rearing issues of the family.

9. By the March 1999 hearing, the Petition for Appeal to this Court had been filed. The lower court heard the testimony of Nancy Conner of child protective services, indicating that the boys were progressing well in foster care, and delayed any further decisions regarding visitation until this Court issued its decision on the petition for appeal.

10. The right to post-termination visitation is a right of the child, not the parent. *In re Christina L.*, 194 W.Va. 446, 453, 460, S.E.2d 692, 699 n. 9. It is the right of the child to continued association with those with whom he shares an emotional bond which governs the decision.

**6**

things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

We also expressed the superiority of the rights of the children in syllabus point three of *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996), explaining that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." In *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 470 S.E.2d 205 (1996), we explained that post-termination visitation should be permitted if it is in the children's best interest and "would not unreasonably interfere with their permanent placement." *Id.* at 260, 470 S.E.2d at 214. Such determination of whether the post-termination visitation would interfere with the children's permanent placement indicates the necessity for the formulation of a permanency plan prior to the decision regarding post-termination visitation.

Unfortunately for these children, their case was fraught with difficulties long before the commencement of the visitation issue which is now before this Court. The children have been left with the parents for a lengthy period of time, indeed all the formative years of their lives, and have formed a close emotional bond with their parents. Now they are being "rescued" into an uncertain future—no permanent placement and no one definitely committed to them.[11] Where allegations of neglect[12] are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system[13] makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement.[14] According to the evidence of record, the children in the present case have developed an intense emotional bond with their parents, making separation excruciatingly painful for the children and the parents. Additionally, as the children have become older, their likelihood of being placed in adoptive homes has decreased, further prejudicing their chances for permanency.

We have previously discussed the need for concurrent planning. Concurrent planning, wherein a permanent placement plan for the child(ren) in the event reunification with the family is unsuccessful is developed contemporaneously with reunification efforts, is in the best interests of children in abuse and neglect proceedings.[15] Implementation of con-

---

11. Although counsel on oral argument represented that he believed the current foster placement might result in a permanent placement, there was nothing in the record to definitively support this potential.

12. Where the charge is abuse as opposed to neglect, the obligation to provide remedial services is far less substantial.

13. By reference to the social services system, we include not only the DHHR, but also the myriad of other service agencies charged with providing services to families, including those agencies providing services to this family, as listed in footnotes five and eight. These include private, non-profit agencies such as Action Youth Care which receive referrals from DHHR, hospitals, schools, and private psychologists.

14. It is axiomatic that the older children become and the more troubled they become, the more difficult it is to find adoptive homes.

15. In *In re Lilley*, 719 A.2d 327 (Pa.Super.1998), the following explanation of new federal legislation was provided:

On November 19, 1997 President Clinton signed the Adoption and Safe Families Act of 1997 (ASFA), Public Law 105–89, [42 U.S.C. 675(5)(C)] which amends the Titles IVB and IV–E of the Social Security Act. ASFA establishes unequivocally that the goals for children in the child welfare system are safety, permanency and well-being. The law intends to make the child welfare system more responsive to the multiple, frequently complex, needs of children and their families. While affirming

current planning [16] would have been beneficial to these children, permitting continued services to the family in an effort to maintain family unity while also planning an alternative resolution should such services be unsuccessful. If such concurrent planning had been effectuated, two very essential results may have occurred: (1) the children may have been more immediately placed in permanent foster or adoptive homes subsequent to termination; and (2) specifically relevant to the issue squarely before us, the lower court could legitimately have made a finding regarding whether post-termination visitation was in the best interest of the children, with specific reference to a definitive permanent custody arrangement. Thus, a perma-

nency plan for abused and neglected children designating their permanent placement should generally be established prior to a determination of whether post-termination visitation is appropriate. Where children have a substantial emotional bond with their parents, the termination of parental rights based upon intellectual incapacity of parents and denial of post-termination visitation, without any definitive permanent plan in place, is tantamount to throwing the children out of the frying pan into the fire.

In the present case, based primarily upon the parents' intellectual incapacity, the needs of the children have not been met, and the resulting living conditions constitute

---

the need to forge linkage between the child welfare system and other support systems for families, the child welfare system and the courts, the law reaffirms the need to assure the safety and well-being of children and their families. The law provides renewed impetus to dismantling the barriers to permanence existing for children in placement and the need for permanency for these children. ASFA embodies several key principles that must be considered in implementing the law:
. The child's safety is the paramount concern. All decisions made must be based on the child's safety and well-being.
. Substitute care is a temporary setting. It is not a place for children to grow up. For children who cannot safely return home, the law provides for an expedited process to find these children permanent homes.
. Permanency planning for children begins as soon as the child enters substitute care. From the time a child enters placement, the agency must be diligent in finding a permanent family for the child.
. The practice of concurrent planning is encouraged by ASFA to facilitate finding a permanent home for a child in a timely manner.
. Achieving permanency for children requires timely decisions from all elements of the child serving system.
. Innovative approaches are needed to produce change. The law envisions real change in the child welfare program.
*Id.* at 334 n. 5.

**16.** Rule 28 of the Rules of Abuse and Neglect Proceedings requires the DHHR to prepare the child's case plan. The following information should comprise a part of that case plan:

(c) When the Department's recommendation includes placement of the child away from home, whether temporarily or permanently, the report also shall include:

(1) An explanation why the child cannot be protected from the identified problems in the home even with the provision of service or why placement in the home is not in the best interest of the child;
(2) Identification of relatives or friends who were contacted about providing a suitable and safe permanent placement for the child;
(3) A description of the recommended placement or type of home or institutional placement in which the child is to be placed, including its distance from the child's home and whether or not it is the least restrictive (most family-like) one available and including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to assure that the child receives proper care and that services are provided to the parents, child and foster parents in order to improve the conditions in the parent's(s')/respondent's('s) home, facilitate return of the child to his or her own home, or the permanent placement of the child;
(4) A suggested visitation plan including an explanation of any conditions be placed on the visits;
(5) A statement of the child's special needs and the ways they should be met while in placement;
(6) The location of any siblings and, if siblings are separated, a statement of the reasons for the separation and the steps required to unite them as quickly as possible and to maintain regular contact during the separation if it is in the child's best interest . . . .
W.Va. R. P. Abuse & Neglect Pro. 28(c). *See In re Micah Alyn R.*, 202 W.Va. 400, 409, 504 S.E.2d 635, 644 (1998) (Workman, J., concurring) ("concurrent planning for permanency should occur even where parental rights are not terminated. This should be the practice in all abuse and neglect cases, so that there is a permanency plan for children where family reconciliation efforts are not successful for whatever reason").

**8**

neglect. However, the social services and legal systems have left these children with their parents for eleven and twelve years, with resultant strong emotional bonds. In such circumstances, the emotional bonds between the parents and child(ren) should be closely evaluated to determine the appropriate course of action. We therefore remand this matter for implementation of permanency plans and additional evaluation regarding the potential for successful post-termination visitation, both after the permanency plans are implemented and in the interim.

Reversed and remanded with directions.