# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re*: **T.T. and B.P.**

**No. 16-1119** (Mercer County 15-JA-002-DS & 15-JA-003-DS)

**FILED**

**May 22, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Father F.T., by counsel Gerald R. Linkous, appeals the Circuit Court of Mercer County's November 4, 2016, order terminating his parental, custodial, and guardianship rights to T.T. and B.P.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Elizabeth A. French, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his parental, custodial, and guardianship rights without requiring the DHHR to determine if he could care for the children with long-term services and without considering a less-restrictive dispositional alternative.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2015, the DHHR filed an abuse and neglect petition against the parents based on a referral regarding infant T.T.'s recent emergency room visits. According to the

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

[2]We note that West Virginia Code §§ 49-1-1 through 49-11-10 were repealed and recodified during the 2015 Regular Session of the West Virginia Legislature. The new enactment, West Virginia Code §§ 49-1-101 through 49-7-304, has minor stylistic changes and became effective on May 20, 2015. In this memorandum decision, we apply the statutes as they existed during the pendency of the proceedings below. It is important to note, however, that the abuse and neglect statutes underwent minor stylistic revisions and the applicable changes have no impact on the Court's decision herein.

1

petition, the child, born in October of 2014, had been to the emergency room three times with upper respiratory infections that required x-rays. During a visit when the child was roughly two months old, medical staff identified a healing fracture on the ninth rib that was not present during the child's previous visit. Thereafter, at a visit shortly before the petition's filing, staff identified the same fracture in addition to a new healing fracture on the child's tenth rib with a potential fracture on the eleventh rib.

Initially, the parents were unable to explain how the child sustained these injuries. Moreover, the paternal grandparents, with whom the parents lived, similarly could not explain the injuries. As such, the DHHR implemented a protection plan whereby the parents were not to be left alone with the child. Eventually, the parents explained the injuries by stating that in late November/early December of 2015, petitioner fell asleep with the child on his chest and the child fell off. According to petitioner, he grabbed the child to keep him from falling. The parents also indicated that, as a result of the child's respiratory infection, he stopped breathing on another occasion which required the grandmother to shake him. Ultimately, the West Virginia State Police consulted Dr. Joan Phillips, who recommended that the child be taken to a hospital to be evaluated for potential physical abuse.

According to the petition, the child was admitted to the hospital on January 7, 2015, and the DHHR later received a report that the child sustained fractures to his ninth, tenth, and eleventh ribs. The report further concluded that these injuries were suspicious for non-accidental trauma, with a pediatric abuse expert indicating that there was a ninety-five percent predictability that the injuries were due to abuse. The expert further opined that the parents' explanations were not reasonable in light of the injuries. The DHHR also learned that petitioner had another child, B.P., who lived with a different mother. According to the DHHR, petitioner sought neither custody of, nor visitation with, B.P., and he stated that he wished to voluntarily relinquish his parental rights to that child.

In June of 2015, the circuit court held an adjudicatory hearing, during which petitioner stipulated to injuring T.T. in a physical altercation with the mother. Specifically, petitioner indicated that he and the mother were fighting over who would get to hold the infant when the child sustained the injuries. The circuit court also granted petitioner a post-adjudicatory improvement period. As part of his improvement period, petitioner underwent a psychological evaluation.

During his evaluation, petitioner indicated that Child Protective Services ("CPS") became involved in the matter because he took his child to the emergency room. He also told the psychologist that he threw the infant up in the air a few times. According to the psychologist, petitioner did not know an infant cannot be thrown in this manner and similarly did not know that an infant needed to be held in such a way as to support its neck. He additionally told the psychologist that the mother slammed the child on the bed. Following the evaluation, the psychologist listed the diagnostic impressions of petitioner as child neglect, mild intellectual disability, and antisocial personality disorder. The evaluation detailed petitioner's long-term history of violence and aggression and concluded that his tendencies were concerning, given the child's injuries. According to the psychologist, petitioner indicated that "he has had rages with blackouts in which he was violent toward others." Petitioner also disclosed that he was

2

suspended from high school more than thirty times, including an incident in which he assaulted the school's principal. Based upon these issues, the psychologist expressed "significant doubt about [petitioner's] ability to care for himself or for a child." Moreover, the psychologist was concerned by the fact that petitioner believed that he was a competent and capable parent, while he viewed "his children in extremely negative terms."

Ultimately, the psychologist concluded that petitioner's "history of aggression and violence, uncontrollable anger, drug abuse and criminal activity" rendered him unfit to care for children. Specifically, the psychologist stated that "there is nothing . . . to recommend [petitioner] as a parent and much to indicate he is incapable of effectively caring for a child and likely represents a danger to a child." According to the psychologist, petitioner's issues impeding his ability to care for a child were "all but insurmountable" and his prognosis for improved parenting was "virtually non-existent."

Thereafter, petitioner retained a separate psychologist to review his evaluation and render his own conclusions. By letter dated December 17, 2015, this second psychologist stated that "[t]he fact that [the first psychologist] did not offer any recommendations is not entirely surprising given [petitioner's] reported highly problematic history." The second psychologist then offered a list of actions petitioner could take that would show he is more suitable to raise a child. This list included, among other requirements, that petitioner display no aggressive or violent behavior toward another person and participate in social skills training classes with no unexcused absences. According to this second psychologist, if petitioner complied with the requirements regarding sustaining responsible and adaptive behavior, "he could be ready to start interacting with his son in six months to a year."

The circuit court held a dispositional hearing in October of 2016. During the hearing, the ongoing CPS worker testified that petitioner had not improved during the proceedings. He failed to visit child B.P. at all and he indicated that he did not want to continue complying with services such as parenting and adult skills education. The DHHR also expressed concerns over the paternal grandparents because of the grandfather's prior involuntary termination of parental rights to children and the grandmother's violent and aggressive behavior toward service providers. The CPS worker also testified to an incident in which petitioner scared T.T by screaming in a car they were traveling in, in addition to engaging the mother in an altercation over a cell phone. Ultimately, the CPS worker testified that petitioner did not have the capacity to parent the child, especially given the child's special needs as a result of his cleft palate that required multiple surgeries. Petitioner's parenting provider testified that he made no progress in making the home safer for the children as he displayed no improvement in his ability to understand the parenting information conveyed to him. The provider also testified to instances in which petitioner would swear because he found it difficult to change the child's diaper. Moreover, the circuit court heard evidence that petitioner attended only half of his scheduled visits with the child. Petitioner also testified to his ongoing reporting to the local day report center over charges of domestic battery related to B.P.'s mother. Ultimately, the circuit court

terminated petitioner's parental, custodial, and guardianship rights to the children because of his inability to parent them.[3] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). Upon our review, the Court finds no error in the circuit court's termination of petitioner's parental, custodial, and guardianship rights.

First, petitioner argues that the circuit court erred in terminating his parental, custodial, and guardianship rights without requiring the DHHR to make a determination as to whether he could parent the children with intensive, long-term assistance. We have previously held that

> "Where allegations of neglect are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement." Syllabus point 4, *In re Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173 (1999).

---

[3]Petitioner's parental rights to both children were terminated below. According to respondents, as of the filing of their briefs, child B.P. remains in the custody of her non-offending mother with a permanency plan of remaining in the home. Respondents further state that child T.T. remains in the same foster home he has resided in since the DHHR originally took custody. According to respondents, the permanency plan for T.T. is adoption into this home. However, the parties and the record are silent as to the parental rights of the mother of T.T.

Syl. Pt. 4, *In re Maranda T.*, 223 W.Va. 512, 678 S.E.2d 18 (2009). According to petitioner, he requested such a determination at the dispositional hearing, but was told that it was too late for such an evaluation to be undertaken. The Court, however, notes that the determination as to whether or not petitioner could properly parent the children with intensive, long-term assistance was made early in the proceedings when petitioner underwent his psychological evaluation. As set forth above, the psychologist that evaluated petitioner specifically concluded that petitioner's "history of aggression and violence, uncontrollable anger, drug abuse and criminal activity" rendered him unfit to care for children. In fact, the psychologist not only found that petitioner was incapable of caring for a child, but she found that he represented an active danger in his capacity as a parent. Ultimately, the psychologist who evaluated petitioner found that the impediments to his parenting were "all but insurmountable" and his prognosis for improved parenting was "virtually non-existent."

Moreover, the psychologist who petitioner retained to review this evaluation explicitly stated that the first psychologist's lack of recommendations for improved parenting made sense, given petitioner's history. This second psychologist, however, did opine as to certain steps petitioner could take in order to even be allowed to interact with his children in six months to one year. These recommendations included petitioner refraining from displaying aggressive behavior towards others and fully participating in adult skills education without any unexcused absences. The record shows, however, that petitioner continued his aggressive behavior by engaging in altercations in a service provider's presence. Specifically, the provider testified to incidents in which petitioner scared T.T. by yelling in a car and engaged in an altercation with the mother over a cell phone. Additionally, petitioner was submitting to the local day report center due to charges of domestic violence as of the dispositional hearing. Further, the record is clear that petitioner specifically told one provider that he did not wish to continue with parent and adult life skills education because he believed the DHHR was seeking termination of his parental rights.

Accordingly, it is clear that petitioner was unable to comply with these basic requirements for services to improve his parenting such that he might interact with the children. The record shows that the DHHR obtained an opinion on petitioner's inability to improve his parenting and the psychologist recommended no services due to petitioner's inability to correct the conditions giving rise to the abuse and neglect at issue. Moreover, petitioner's own psychologist similarly recommended minimal steps for petitioner to take in improving his ability to parent, yet he failed to comply with the same. As such, it is clear that, because of petitioner's violent and aggressive tendencies, coupled with his inability to follow the psychologist's recommendations, he would have been unable to properly care for the children even with the implementation of long-term assistance. Accordingly, we find no error.

Finally, petitioner argues that the circuit court should have implemented a less-restrictive dispositional alternative. We do not agree. Pursuant to West Virginia Code § 49-4-604(c)(3), a situation in which there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected includes one in which

> [t]he abusing parent . . . [has] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the

abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child .
. . .

Based upon the substantial evidence outlined above, the circuit court was presented with sufficient evidence upon which to base a finding that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect because he failed to follow through with services. Specifically, the circuit court found that petitioner lacked the capacity to parent, as evidenced by his failure to follow through with the services offered or implement the skills he learned therein. The circuit court further found that termination of petitioner's parental, custodial, and guardianship rights was in the children's best interests. Pursuant to West Virginia Code § 49-4-604(b)(6), circuit courts are directed to terminate a parent's parental, custodial, and guardianship rights upon such findings. Further, we have held as follows:

> "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va.Code [§] 49-6-5 [now West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va.Code [§] 49-6-5(b) [now West Virginia Code § 49-4-604(c)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W.Va. 558, 712 S.E.2d 55 (2011). Accordingly, we find no error below.

Finally, because the record is silent as to the status of the parental rights of T.T.'s mother, this Court reminds the circuit court of its duty to establish permanency for the children. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires:

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Further, this Court reminds the circuit court of its duty pursuant to Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings to find permanent placement for the children within twelve months of the date of the disposition order. As this Court has stated,

> [t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedures for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

6

*Cecil T.*, 228 W.Va. at 91, 717 S.E.2d at 875, Syl. Pt. 6. Moreover, this Court has stated that

> [i]n determining the appropriate permanent out-of-home placement of a child under W.Va.Code § 49-6-5(a)(6) [1996] [now West Virginia Code § 49-4-604(b)(6)], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home can not be found.

Syl. Pt. 3, *State v. Michael M.*, 202 W.Va. 350, 504 S.E.2d 177 (1998). Finally, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991).

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 4, 2016, order is hereby affirmed.

Affirmed.

**ISSUED**: May 22, 2017

**CONCURRED IN BY**:

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker