**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**March 16, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **S.G.**

**No. 20-0590** (Monongalia County 19-JA-74)


**MEMORANDUM DECISION**


Petitioner Mother K.G., by counsel Kristen D. Antolini, appeals the Circuit Court of Monongalia County's July 2, 2020, order terminating her parental rights to S.G.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Jason E. Wingfield, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in finding probable cause for the removal of the child, granting the DHHR's motion for a second psychological and parental fitness evaluation, and terminating petitioner's parental rights without first granting her a post-adjudicatory improvement period.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Prior to the initiation of the instant proceedings, petitioner was the subject of child abuse and neglect proceedings with regard to three older children in 2017 based upon her involvement with a man who physically abused the children. There were also allegations that the children were exposed to domestic violence, nutritionally neglected, and that the home was unfit and

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

unsanitary.[2] Although petitioner was granted a post-adjudicatory improvement period, the improvement period was revoked for lack of progress. Petitioner eventually voluntarily relinquished her parental rights to those children at a dispositional hearing in January of 2019.

Three months later, petitioner prematurely gave birth to S.G. The DHHR received a referral from hospital staff stating concerns that petitioner previously relinquished her parental rights to three other children and, because the prior case involved unsafe and unfit living conditions, the reporter had concerns about the current conditions of the home. Given these concerns and the extreme circumstances surrounding petitioner's prior abuse and neglect proceeding, the DHHR filed the instant child abuse and neglect petition against petitioner in April of 2019. According to the DHHR, in light of petitioner's past history with inappropriate people, it conducted a background check of her roommate, which revealed that the roommate's parental rights to her own children were involuntarily terminated in 2007. A Child Protective Services ("CPS") worker investigated petitioner's prior case and learned that she had not completed parenting and adult life skills classes prior to her relinquishment of her parental rights and that petitioner's psychological and parental fitness evaluation completed in 2018 required that she complete such classes before having the children returned to her care. Specifically, the DHHR alleged that petitioner had not demonstrated in her previous case that she had learned to properly parent, had not successfully completed parenting and adult life skills, nor "demonstrated an internalization of understanding how to parent." In conclusion, the DHHR alleged that there was no reasonable alternative to the removal of the child due to petitioner's inability to provide S.G. with the necessary care, attention, and supervision needed for a premature newborn child, and that petitioner failed to retain and apply any parenting skills previously taught in prior cases.

Prior to the preliminary hearing, the DHHR submitted a court summary that explained that S.G. was born premature and suffered from several health issues that required intensive care. S.G. was deemed medically fragile, and the doctor ordered that she not be taken to public places other than doctor's appointments. The DHHR also reported concerns arising from law enforcement's responding to calls at petitioner's address in January and February of 2019. Additionally, the report stated that petitioner had continued individual therapy sessions after she relinquished her parental rights in the 2017 case but continued to deny responsibility for the conditions of abuse and neglect in both the 2013 and 2017 cases during the therapy sessions.

In late April of 2019, the circuit court held a contested preliminary hearing. The CPS worker testified consistently with the allegations in the petition and further explained that petitioner's roommate who was to help care for S.G. had her own parental rights previously terminated for failing to feed her child. The worker further stated that the DHHR had spent $20,860.08 on services such as parenting and adult life skills sessions and transportation services for petitioner in the 2017 case. Additionally, the worker described a report from a DHHR provider from the 2017 case showing that petitioner failed to complete her parenting and adult life skills classes and had not made progress during the time she attended sessions. The worker also stated that the previous service provider expressed concerns with petitioner's mental health.

---

[2]The record also shows that petitioner had a prior child abuse and neglect case involving the same three children in 2013.

Finally, the worked explained that she sought emergency custody of the medically fragile newborn because of the history of petitioner's 2017 case, which closed merely three months prior; petitioner's apparent inability to parent as she made no progress in her parenting in the prior case; petitioner's failure to acknowledge the abuse and neglect in the prior case; petitioner's lack of positive changes since the prior case except for continuing individual therapy; and petitioner's unsuitable home environment.

On cross-examination by petitioner's counsel, when asked whether the DHHR was required to file a petition when a parent previously relinquished parental rights to another child, the DHHR worker answered "[w]e are not required to, but it is up to the [DHHR] and also to look at the safety of the child" and that "we have to look at each case independently to see how far a person has come with the previous case and the knowledge we had before." The worker further stated that petitioner had not sought independent parenting services since the prior case and, therefore, had not gained the knowledge and ability to parent S.G. Upon the guardian's cross-examination, the CPS worker stated that the DHHR had a duty to investigate all referrals and that the DHHR received a referral from the hospital when S.G. was born. When asked to describe details of the conditions of abuse and neglect in petitioner's prior 2017 case, the worker explained that one child was an infant who failed to thrive in petitioner's case, resulting in deformities to his limbs, lack of muscle tone, and overall lack of development. She also stated that petitioner had no bond with that infant and that his head was misshaped from sitting in car seats for too long. Additionally, the prior case involved allegations of physical abuse as the children were excessively disciplined, locked in their rooms, and struck with objects, which left bruises. The worker also stated that petitioner's home was unsanitary with garbage piled on the floors. When asked if petitioner had any CPS intervention prior to the 2017 case, the worker responded that petitioner had a previous removal in 2013 for child endangerment and physical abuse, but that the children were ultimately returned to her care.

Next, petitioner testified that she obtained all required prenatal care for S.G., obtained all necessary items for S.G.'s care, continued individual therapy sessions, and by February of 2019, had finally accepted responsibility for her failures in the 2017 case because she "had a lot of time to think and stuff." She further testified that her home was in "immaculate condition" and that her roommate moved out. When asked about the conditions of abuse in the prior case, she responded that there were no nutritional issues, only issues with the condition of the home.

Ultimately, the circuit court found probable cause that the child was in imminent danger and that there were no reasonable alternatives to S.G.'s removal. In support of this finding, the circuit court explained that it based the ruling solely on the child at issue and not "on any prior rulings about the prior children." The circuit court stated that its concerns were based solely on the "present problem" and "present situation," and that the child was in imminent danger because of "its physical needs and going home with [petitioner] is not appropriate at this time."

Shortly after the preliminary hearing, the DHHR submitted a court summary indicating the S.G. suffered from additional health problems and remained extremely fragile. Further, the summary stated that petitioner was evicted from her home for failure to pay rent and that the DHHR was concerned with petitioner's lack of income and stable housing. The summary stated that "[i]t is questionable as to whether or not [petitioner] can effectively parent such a young

3

infant with medical issues, frequent feedings, frequent doctor appointments, specialists that [S.G.] will need to see. It may be an issue for [petitioner] to meet her own personal needs."

In May of 2019, the circuit court held a hearing scheduled for adjudication, but instead granted petitioner's motion for a preadjudicatory improvement period in light of petitioner's obtaining parenting classes from the hospital and her promise to seek employment and housing. The terms of petitioner's improvement period included her participation in multidisciplinary team ("MDT") meetings, receiving and participating in adult life skills and parenting classes, signing all releases, and providing the MDT members with all necessary medical records. In August of 2019, the circuit court held a review hearing, wherein the DHHR reported that petitioner was largely complying with the terms and conditions of her improvement period, but the court nevertheless set the matter for adjudication.

Petitioner participated in a psychological and parental fitness evaluation in August of 2019 with Dr. Edward Baker. The report concluded that petitioner had the "parental capacity to care, protect, and change in order to provide adequately for her child" and assessed petitioner's prognosis for doing so as "fair." However, the report further indicated that petitioner's "Child Abuse Potential Inventory" was invalid and "could not be meaningfully interpreted." Unsatisfied with this conclusion, the DHHR moved to have a second opinion, arguing that Dr. Baker's recommendation "greatly differed" from the recommendations in petitioner's 2018 evaluation. Petitioner objected. However, the circuit court granted the DHHR's motion, and in October of 2019, petitioner underwent a second evaluation with Dr. Martin Boone, who concluded that petitioner currently lacked the parental capacity to care, protect, and provide for the child and that her prognosis for improvement was "guarded."

In December of 2019, the circuit court held an adjudicatory hearing. Petitioner stipulated that she failed to provide a safe and suitable home for the child by allowing inappropriate people to live in the home. The circuit court learned that in early December of 2019, petitioner allowed a man who was a registered sex offender move in and live with her. Petitioner moved for a post-adjudicatory improvement period, and the circuit court held the motion in abeyance.

The circuit court held the dispositional hearing over the course of three days in March and May of 2020. At the hearings, the DHHR presented its court summary, which recommended the termination of petitioner's parental rights based on the circumstances underlying the prior proceeding, petitioner's failure to address her mental health issues, and the results of petitioner's most recent psychological and parental fitness evaluation. First, Dr. Boone testified that despite petitioner's best efforts to improve her parenting, she lacked the intellectual and cognitive ability to safely parent S.G. and that these deficits could not be remedied. A service provider who supervised visitations testified that petitioner failed to comprehend instructions, resulting in her inability to properly feed and care for the child. An independent service provider testified that petitioner had attended general parenting education classes since June of 2019.

The DHHR case worker testified that she was petitioner's case worker in the 2017 case that resolved in January of 2019.The DHHR worker stated that despite the receipt of extensive services over the years, petitioner remained unable to safely parent any child, let alone a premature newborn infant with many health issues. The guardian's previously filed report

disclosed that petitioner continued to allow unsafe individuals in the home, including a sex offender. Dr. Baker then testified that petitioner had a low intellectual capacity but had the minimum cognitive ability necessary to parent. However, Dr. Baker clarified that petitioner had not been forthright during the evaluation he conducted, leading to inconclusive "faking good" results. Lastly, he stated that he was unaware of S.G.'s prematurity and special needs of care at the time of the evaluation and that his opinion may have changed had he known that information. The circuit court recessed and set another date to continue the proceedings.

At the final dispositional hearing in May of 2020, petitioner testified that she was employed, had adequate housing, had the necessary supplies and items for S.G.'s care, and had explored options for S.G.'s daycare. She stated that she had participated in therapy since the prior CPS case and had participated in adult life skills and parenting education classes since June of 2019. Petitioner described which doctors she would take S.G. to for her healthcare needs. Next, S.G.'s foster mother testified that S.G. suffered from several congenital health issues, including a hemangioma in her ear canal that required daily medication to prevent hearing loss. She explained that the medication affects S.G.'s blood sugar, requiring the child's levels to be closely monitored. Further, she stated that S.G. had acid reflux, which required special feeding techniques and a special formula blend. She stated that she gave detailed instructions to petitioner for feeding S.G. during supervised visitations, but petitioner failed to follow the directions, resulting in S.G. frequently vomiting at visits. Finally, the foster mother stated that on two occasions, S.G. was returned from visits with minor injuries from falling and bumping her head due to petitioner's inability to supervise and care for her. Having reviewed the evidence presented, the circuit court denied petitioner's motion for a post-adjudicatory improvement period and terminated her parental rights upon finding that there was no reasonable likelihood that she could correct the conditions of abuse and neglect in the near future and that termination was necessary for the child's welfare. An order terminating petitioner's parental rights was entered on July 2, 2020.[3]

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record

---

[3]The father's parental rights were also terminated below. The permanency plan for the child is adoption by the same foster family as her siblings.

viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in finding probable cause that S.G. was in imminent danger. According to petitioner, at the time of S.G.'s removal, the DHHR stated only two concerns: petitioner previously relinquished her parental rights to three children three months prior and petitioner failed to complete parenting and adult life skills in the prior case. Petitioner contends that these concerns were inadequate to find probable cause as only involuntary terminations of parental rights require the DHHR to file a petition for subsequently born children. *See In re George Glen B., Jr.*, 207 W. Va. 346, 352–53, 532 S.E.2d 64, 70–71 (2000). Further, petitioner argues that she was treated unfairly as she previously relinquished her parental rights for the sole purpose of "protection" from future CPS involvement. We find, however, that these arguments do not entitle petitioner to relief.

According to West Virginia Code § 49-4-602(a)(1), the circuit court may order the removal of a child if it finds that "there exists imminent danger to the physical well-being of the child" and "[t]here are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody." West Virginia Code § 49-1-201 defines "[i]mminent danger to the physical well-being of the child" to mean "an emergency situation in which the welfare or the life of the child is threatened." This provision further delineates the following threatening conditions: nonaccidental trauma, physical abuse, nutritional and medical neglect, abandonment, substantial emotional abuse, the sale of a child, alcohol or drug impaired parenting, and "[a]ny other condition that threatens the health, life or safety of any child in the home." W. Va. Code § 49-1-201.

Here, the record shows that the DHHR specifically relied upon the last provision when it removed S.G. from petitioner's home. While petitioner is correct that two of the reasons stated by the DHHR within its petition for removal were petitioner's very recent relinquishments to other children and her failure to address her deficiencies in parenting by completing a parenting course, petitioner ignores the other evidence presented at the preliminary hearing. Testimony established that additional reasons existed for the removal, including petitioner's unsafe home with a roommate and proposed caregiver who previously had her parental rights terminated to her own children—one of the grounds for which was nutritional neglect of an infant. Further, testimony established that petitioner had done nothing to address her parenting deficiencies in the three months between her relinquishments and S.G.'s birth and that she failed to acknowledge any wrongdoing to her therapist. Additionally, the evidence established that S.G. was an extremely fragile premature infant who required specialized care. Most importantly, the record shows that the DHHR worker responded to an anonymous referral from hospital staff after S.G.'s birth. This is contrary to petitioner's assertion that the DHHR treated her "unfairly" by filing a petition based upon the conditions of abuse and neglect that resulted in petitioner's prior relinquishments and continued, unabated. In light of the overwhelming evidence that petitioner had not improved her ability to parent since her prior case, S.G. being an extremely

6

fragile newborn, and petitioner's inappropriate home, we find no error in the circuit court finding probable cause that S.G. was in imminent danger.

Next, petitioner argues that the circuit court erred by granting the DHHR's motion for a second psychological and parental fitness evaluation when it was dissatisfied with petitioner's favorable results in the first evaluation. Petitioner argues that the DHHR desired to create barriers to reunification with S.G. and sought a second expert to give a negative recommendation regarding petitioner's ability to parent. Petitioner contends that the circuit court erred by allowing the DHHR to obtain multiple psychological evaluations "close in time together" until it "achieves the results that it wants."

West Virginia Code § 49-4-603(a)(1) provides as follows:

At any time during proceedings under this article the court may, upon its own motion or upon motion of the child or other parties, order the child or other parties to be examined by a physician, psychologist or psychiatrist, and may require testimony from the expert, subject to cross-examination and the rules of evidence.

According to the record, petitioner had undergone three court ordered psychological and parental fitness evaluations—one in 2018 in the prior proceeding and two during the instant proceeding. In its motion for the second evaluation, the DHHR explained that the petition was filed, in part, due to petitioner's inability to parent as indicated by the recommendation of her 2018 psychological and parental fitness evaluation, and that Dr. Baker's recommendations and findings "differed greatly" from the 2018 evaluation. Furthermore, Dr. Baker's evaluation indicated that petitioner was not forthright with her answers and the report further indicated that petitioner's "Child Abuse Potential Inventory" was invalid and "could not be meaningfully interpreted." Dr. Baker later confirmed these issues with his evaluation of petitioner during his testimony at the dispositional hearing. Specifically, Dr. Baker testified that petitioner's lack of truthfulness led to inconclusive "faking good" results in the evaluation and that had he known of S.G.'s extreme needs of care, he would have factored that information into his evaluation, which could have changed the outcome. In light of the issues with Dr. Baker's evaluation, we find no error in the circuit court's granting of the DHHR's motion for another updated psychological and parental fitness evaluation of petitioner.

Finally, petitioner argues that the circuit court erred in terminating her parental rights without first granting her a post-adjudicatory improvement period. Petitioner contends that there was a reasonable likelihood that she could correct the conditions of abuse and neglect in the near future as she made substantial improvements in completing services and gave her full effort in the case. Additionally, she cites her "hard work with counseling, parenting, adult life skills, and employment" as proof that she experienced a substantial change of circumstances. Further, petitioner relies on Syllabus Point four of *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999), to argue that due to petitioner's issues of intellectual incapacity, the DHHR was required to "make some additional efforts" to help petitioner with her ability to parent and that a "thorough effort" was not made by the DHHR as it failed to increase petitioner's visitation to

allow her more time to learn how to take care of S.G.[4] Finally, petitioner argues that the DHHR did not make reasonable efforts to reunify petitioner with S.G.

This Court has held that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period." *In re Emily*, 208 W. Va. 325, 336, 540 S.E.2d 542, 553 (2000). West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." Because petitioner was previously granted a preadjudicatory improvement period, she must also demonstrate that since the initial improvement period, she has experienced a substantial change in circumstances. W. Va. Code § 49-4-610(2)(D). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Most importantly, we have long held that, "when a parent cannot demonstrate that he/she will be able to correct the conditions of abuse and/or neglect with which he/she has been charged, an improvement period need not be awarded before the circuit court may terminate the offending parent's parental rights." *Emily*, 208 W. Va. at 336, 540 S.E.2d at 553.

Contrary to petitioner's argument, we find that she did not demonstrate that she experienced a substantial change in circumstances. While petitioner points out that she complied with many of the terms and conditions of her preadjudicatory improvement period, petitioner fails to acknowledge that she never demonstrated adequate parenting ability to take care of S.G. Critically, petitioner was unable to properly follow directions from the foster mother and properly feed S.G. in a way that accommodated her many dietary issues. Further, she dropped S.G. or failed to cradle her head, resulting in minor injuries. Additionally, the record shows that petitioner continued to allow inappropriate people to live in her home, which has been a concern since petitioner's first CPS case. Most importantly, the circuit court found that the circumstances underlying petitioner's prior abuse and neglect proceeding were still present in the current proceedings, namely petitioner's inability to parent despite years of lengthy instruction, explanation, supervision, and coaching. Indeed, the instant case was initiated just three months after the prior abuse and neglect proceedings ended, during which time petitioner failed to make any substantial changes in her behavior, other than attending individualized therapy sessions, despite the provision of numerous services through her improvement period in the prior case. By petitioner's own admission, she failed to comply with the terms and conditions of the prior

---

[4]Syllabus Point four of *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999), provides

> [w]here allegations of neglect are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement.

improvement period, ultimately prompting her decision to relinquish her parental rights to gain "protection" from CPS involvement with unborn S.G. Finally, petitioner's prognosis for minimally adequate parenting was rated as "fair" in Dr. Baker's evaluation and "guarded" in Dr. Boone's evaluation. Given this evidence, we find no error in the circuit court's decision to deny petitioner a post-adjudicatory improvement period.

The above evidence likewise supports the termination of petitioner's parental rights. Petitioner claims that the circuit court's finding that there was no reasonable likelihood that she could correct the conditions of abuse or neglect in the near future was erroneous because she could correct the conditions if given additional time through an improvement period. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

The record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse or neglect either on her own or with help. As noted above, petitioner was granted a preadjudicatory improvement period in the current case, multiple services in her prior cases, and was provided with services aimed at correcting her parenting deficits. Petitioner was permitted to relinquish her parental rights at disposition in the 2017 case and, thereafter, continued to allow inappropriate people to live with her such that it would endanger S.G. While petitioner eventually found employment and obtained parenting and adult life skills classes, she failed to address her mental health issues and allowed a sex offender to move into her home. By continuing to engage with inappropriate partners, petitioner has demonstrated that one of the many conditions from the prior abuse and neglect proceeding continues unabated. Moreover, petitioner never demonstrated that she was able to properly take care of S.G. during supervised visitations, let alone juggle S.G.'s multitude of complex health issues. While petitioner points out that she put forth her best efforts, the evidence shows that petitioner remained unable to properly care for S.G. despite multiple improvement periods in multiple cases and nearly eight-years-worth of guidance, advice, coaching, and instruction from the DHHR and others. Therefore, contrary to petitioner's arguments, it is clear that the lower court complied with our directive in *Billy Joe M.* to determine "as quickly as possible" whether petitioner could adequately care for the child with long-term assistance. Further,

> courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.

Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980). Based on this evidence, we cannot find that the circuit court erred in finding that there was no reasonable likelihood that

petitioner could correct the conditions of abuse or neglect in the near future, as petitioner demonstrated an inadequate capacity to solve her issues of impaired judgment on her own or with help.

Insomuch as petitioner claims that she should have been granted a less-restrictive disposition to the termination of her parental rights, we have previously held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Based on the foregoing, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its July 2, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: March 16, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton