**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**
**March 16, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **P.H.-1, L.H. Jr., and P.H.-2**

**No. 20-0657** (Hampshire County 19-JA-49, 19-JA-50, and 19-JA-51)

**MEMORANDUM DECISION**

Petitioner Father L.H., by counsel Jonie E. Nelson, appeals the Circuit Court of Hampshire County's August 5, 2020, order terminating his parental rights to P.H.-1, L.H. Jr., and P.H.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Joyce E. Stewart, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him of abuse and/or neglect, denying him an improvement period, and terminating his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2019, the DHHR filed an abuse and neglect petition against petitioner and P.H.-1's mother[2] alleging that then-two-month-old P.H.-1 suffered nonaccidental trauma while

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because two children share the same initials, they will be referred to as P.H.-1 and P.H.-2 throughout this memorandum decision.

[2]Because the facts below focus primarily on P.H.-1 and her extensive injuries, and because the mother of L.H. Jr. and P.H.-2 is not discussed at length due to her status as a nonabusing parent, the mother of P.H.-1 will simply be referred to as "the mother" throughout this memorandum decision.

(continued . . . )

1

in their care. According to the DHHR, the parents brought the child to Hampshire Memorial Hospital because she was suffering seizures and did not want to take a bottle. The child was transferred to the intensive care unit at Ruby Memorial Hospital, at which point medical personnel discovered that she had suffered two skull fractures, one on each side of her head, with multiple bleeds inside the brain tissue and several areas that appeared to indicate the child had suffered a stroke. According to the medical personnel, the child's injuries were consistent with someone hitting her on the head or having fallen down the stairs. According to the DHHR, petitioner, the mother, and the child's grandparents were present but denied any trauma, including falling, that could have explained the injury. According to petitioner, he put the child to bed the night before her admission to the hospital and checked on her throughout the night. It was not until around 5:30 a.m. on the day of admittance that petitioner noticed that the child "was not acting herself." Additionally, the mother informed the DHHR that the child was behaving normally the day before and that when she came home from work that night, the child was asleep on the couch. The mother also indicated that P.H.-1 had seen a family nurse practitioner for a checkup two days prior to the admission. The only possible explanation the parents offered to medical personnel was that a cat jumped on the child and scratched her face two weeks prior. In fact, the child had dried blood on her face that the mother said was from the cat scratch, but the petition indicated that the blood would not have remained for two weeks. Further, medical personnel were unable to fully assess the child for additional fractures due to repeated seizures. The child's status at that time was extremely critical; she was sedated and placed on a ventilator. Ultimately, medical personnel determined that the child's injuries were consistent with nonaccidental trauma. During the DHHR's investigation, the parents offered several other possible explanations for the injuries, including that the family's dogs knocked the child over while in a walker, bumped into her cradle, or knocked her bouncy seat into the sofa. The parents also alleged that the child fell back against a wall while being photographed, though they did not note any injuries to the child and acknowledged that she did not act as if she was in pain. Following the petition's filing, petitioner waived his preliminary hearing.

The circuit court then held several adjudicatory hearings in January, March, and May of 2020, during which the DHHR presented extensive evidence from DHHR employees and several medical professionals who treated P.H.-1. At the first dispositional hearing, two Child Protective Services ("CPS") workers testified consistently with the allegations in the petition. Specifically, one worker reiterated the facts surrounding the parents' care of P.H.-1 in the days leading up to her admission. According to the first worker, the only other person who had been around the child in the days preceding admission was the child's paternal grandmother, R.H.,[3] who attended

---

[3]At various times in the record, R.H. is referred to differently in relation to the child, including references to her as either the maternal or paternal grandmother or even the paternal great-grandmother. In his brief to this Court, petitioner refers to R.H. as the maternal grandmother, despite the fact that he clearly identified her as his mother—i.e. the paternal grandmother—when specifically asked to clarify the child's relationship to R.H. during one of the adjudicatory hearings below. Regardless of the various manners to which she is referred in the record and in the briefs before this Court, in all instances it is clear that the parties are discussing R.H.

(continued . . . )

the child's medical appointment with the mother. According to the second worker, petitioner gave conflicting accounts of whether anyone else had been around P.H.-1 prior to her injuries. According to the worker, petitioner first indicated that no one had been around the child, then he indicated that "his grandma and [the mother's] grandma had watched the baby a handful of times," before finally indicating R.H. babysat the child twice during the week of the admission. The worker spoke with R.H., who initially denied caring for the child before acknowledging that she did provide care on two occasions during that week. R.H. further indicated that she previously suffered a stroke, and the worker noted that R.H. "seemed to be really hard to keep on task." The worker additionally indicated that during their discussion R.H. made at least one "[c]ompletely off the wall statement" about eating chili that was wholly irrelevant to their discussion. Further, the worker testified that once medical personnel were able to do a full skeletal scan, they found that P.H.-1 suffered two broken ribs and a broken tibia in addition to her other injuries. According to the worker, these injuries were in various stages of healing. The worker further indicated that the child's family nurse practitioner informed her that he did not notice any signs of these injuries during her most recent visit two days prior to admission. Finally, the worker confirmed that the CPS investigation substantiated nonaccidental trauma and lack of supervision based upon the child's unexplained injuries.

At the second adjudicatory hearing, the DHHR introduced testimony from the attending physician in the pediatric intensive care unit at Ruby Memorial Hospital, Dr. Faraon, who also treated P.H.-1. According to Dr. Faraon, the type of hemorrhages that the child suffered happen "if the baby suffers a blow to the head or if the baby is shaken or if the baby's head is squeezed." Dr. Faraon also indicated that the child's rib fractures were a few weeks old upon her admission and that this injury is normally sustained through trauma such as squeezing or blows. Dr. Faraon similarly testified that the child's broken tibia would likely have been the result of being hit or squeezed. Petitioner then called the psychologist who performed his psychological evaluation. According to the psychologist, petitioner suffers from some deficits that are likely to impact his parenting ability, raising concerns that petitioner could not appropriately care for an infant. According to the psychologist, "[t]here are few people at [petitioner's] intellectual ability that can parent" without support or assistance, usually from another parent. The psychologist further testified that petitioner was defensive and unresponsive when questioned, having failed to admit minor or major faults during the evaluation.

At the third adjudicatory hearing, P.H.-1's family nurse practitioner testified that he examined the child two days prior to her hospitalization and that the child presented no complaints or discomforts. The child similarly did not display any of the injuries testified to by Dr. Faraon or any of the purported injuries caused by the cat that the parents described as happening two weeks prior to hospitalization.

Based upon this evidence, the circuit court found that the child suffered injuries that were the result of nonaccidental trauma while in the care of petitioner and the mother. Further, the child displayed injuries in various stages of healing for which there was no plausible explanation or other efforts to identify the perpetrator thereof. In fact, the court found that the parents denied

3

that abuse even occurred, despite evidence of obvious abuse. Of specific importance to the court was the testimony from Dr. Faraon that the bruising on P.H.-1's head indicated that the skull fractures occurred between twelve and twenty-four hours prior to her admission to the hospital, a timeframe in which the only persons the child was exposed to were the parents and R.H. During that period, R.H. watched the child for one hour. Further, although petitioner testified that he knew something was wrong the "day it happened" because the child was "not acting right," he did not seek medical attention for the child until the following morning. Petitioner further contradicted himself by testifying that "he first knew there was something wrong when he attempted to give [P.H.-1] a bottle" the morning of her admission.

According to the circuit court, petitioner initially indicated that he did not know how the child's injuries occurred, but at adjudication he announced his suspicion that his mother, R.H., may have caused them. However, the court noted that approximately two months after the petition was filed, R.H. suffered a medical issue; was hospitalized at the time of adjudication; and, according to petitioner and his sister, was "not doing well, medically." According to testimony from petitioner and his sister, "up until December [of 2019] . . . they did not know of their mother to have any issues with blackouts, dementia, and/or the like, but assert that if those things did occur then maybe that would provide an explanation as to what happened to the child." The court further noted that it was deeply concerned that P.H.-1's medical records noted that a paternal aunt called the hospital to inquire about the child's condition and possessed the code to be able to obtain this information, which had to have been provided by the parents. According to the records, the paternal aunt inquired of hospital staff whether the child's injuries could have been caused by a grandparent shaking P.H.-1. Based on the foregoing, the circuit court found that, although petitioner informed CPS that he wondered if R.H. could have caused the child's injuries during the initial investigation, it was "incredulous that now that [R.H.] is hospitalized and in poor condition, without the ability to communicate, that [petitioner] now has gone from 'wondering' whether . . . [R.H.] caused the injuries to being more conclusive that the child must have been injured by [R.H.]." The court further found that despite his accusations, petitioner

> was unclear in his testimony and waivered on whether he did or did not believe his mother caused the injury and continuously stated that "she did not give him the answer he wanted," but he was unable to articulate what the "answer" she gave him was or any details of their discussions.

Accordingly, the court found it troubling that petitioner took no real action to identify the child's abuser even in the face of hearing testimony from medical professionals. Additionally, petitioner was aware that R.H. had "good days and bad days" at the time of the petition's filing, and the court questioned why he would have allowed her to care for the child.

The court also addressed petitioner's other theories for the child's injuries, including one in which he speculated that the child could suffer from osteogenesis imperfecta, a condition that Dr. Faraon testified affects bones and can cause them to fracture easily. While Dr. Faraon indicated that this could have caused the injuries, the court ordered the child be tested for the condition and the results indicated that she does not suffer from it. Similarly, the child's family nurse practitioner undermined petitioner's other theory, that the child suffered her injuries during

4

birth. According to the family nurse practitioner, the child's ribs likely would not have been broken during birth, given their pliability. Further, it is unlikely that the child's head was injured during birth, given that the only noted injury at birth was a hematoma on the child's head that resolved within two days. As such, the court found by clear and convincing evidence that either or both of the parents committed abuse and/or neglect by inflicting injury on P.H.-1 or failing to protect and ensure the safety and wellbeing of the child. While the court noted that the parents acknowledged that "something had to happen to their child," neither one acknowledged that the child was abused. The court further found that L.H. Jr. and P.H.-2, although not directly abused, were at risk of harm and were also abused and/or neglected children and that petitioner was an abusive and/or neglectful parent.

In June of 2020, the circuit court held a dispositional hearing. Based upon the evidence, the court found that although petitioner acknowledged that something happened to cause P.H.-1's injuries and identified R.H. as "a potential alleged perpetrator," it was not persuaded that he "took any real steps to firmly identify the child's abuser." This was based on the fact that "at the extremely vulnerable age of approximately two . . . months old [the child] suffered significant injuries, which varied in healing stages and remain completely unexplained." According to the court, petitioner offered various explanations for the child's injuries during the proceedings, all of which lacked credibility and contradicted the medical evidence presented. The court further found that petitioner continued to "explain away the infant's injuries" without clearly and credibly identifying the abuser. Although petitioner, at times, voiced suspicion that R.H. caused the child's injuries, he waivered throughout the proceedings on whether he believed that this was the case. In fact, the court found that "it is apparent that if [R.H.] caused the injuries to the child the family has gone to great lengths to protect her at the expense of the infant child." Based on the foregoing, the court found that it could not ensure the children's safety if returned to petitioner and the mother. Accordingly, the court denied petitioner's motion for an improvement period, finding that P.H.-1 was particularly susceptible to future abuse or neglect due to her serious medical conditions. Further, because of petitioner's failure to acknowledge the abuse and neglect at issue, the court found that the problem was untreatable and that there was no reasonable likelihood that the conditions could be substantially corrected. Therefore, the court terminated petitioner's parental rights.[4] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when,

[4]P.H.-1's mother's parental rights were also terminated. The permanency plan for that child is adoption in the current foster home. The mother of L.H. and P.H.-2 is nonabusing, and the permanency plan for those children is to remain in her care.

although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

Petitioner first alleges that the circuit court erred in adjudicating him as an abusive or neglectful parent because it incorrectly found that he identified a potential abuser late in the process, identified incidents as possibly having caused P.H.-1's injuries even though the incidents were inconsistent with the medical testimony, and tested as a child abuser during his psychological examination. Succinctly, petitioner argues that he identified R.H. as a potential abuser during the initial investigation, and he points to her failure to participate in the investigation and his cooperation with law enforcement, including his providing law enforcement with R.H.'s information, as support for this assignment of error. We find, however, that this issue comes down to one of credibility that the circuit court resolved in the DHHR's favor and decline to disturb these findings on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.").

As set forth above, the circuit court was presented with this information below and found that petitioner alternated his position with regard to R.H. as a possible abuser throughout the proceedings. Contrary to petitioner's assertion that he identified R.H. as a possible abuser early in the DHHR's investigation, the record shows that he simply informed the DHHR that R.H. had provided the child with care in the week leading up to the hospitalization and "wondered" if she could have perpetrated the abuse. As the circuit court found, petitioner did not announce his suspicion that R.H. may have perpetrated the abuse until the adjudicatory hearing, the timing of which the circuit court found suspect given that a medical issue rendered R.H. incapable of responding to the allegations at that point. This suspicion was echoed by petitioner's sister in her testimony at adjudication. However, the court noted its extreme concern that the child's medical records indicated that a paternal aunt inquired of hospital staff whether the child's injuries could have been caused by a grandparent shaking P.H.-1. This evidence left the circuit court incredulous that petitioner waited until R.H. could not communicate to accuse her of the abuse. Further compounding the issue was the fact that petitioner was unclear in his testimony as to whether he believed R.H. caused the child's injuries and testified vaguely to having questioned R.H. about the abuse while failing to testify to any specifics of the conversation between the two. While petitioner continues to assert on appeal that his tepid assertions that R.H. caused the abuse constituted an identification of the perpetrator, we agree with the circuit court that petitioner took no real steps to do so. Instead, petitioner conveniently blamed an individual who lacked the ability to communicate but also continued to assert that he did not necessarily believe that she was the actual perpetrator of the abuse. Accordingly, we agree with the circuit court that petitioner took no real action to identify the child's abuser.

6

Petitioner further alleges that it was inappropriate to hold him accountable for pursuing theories of injury that were incongruent with the medical evidence because he was simply trying "to 'brainstorm' plausible explanations in order to aide medical staff." According to petitioner, the circuit court erroneously found that he committed the abuse in question because of the number of explanations he offered, which are not supported by the record. On the contrary, the court never explicitly found that petitioner perpetrated the abuse in question, just that the child was seriously injured by nonaccidental trauma while in his care and that he took no steps to identify the abuser. This is in keeping with this Court's prior direction that

> "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syllabus Point 3, *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 4, *In re Harley C.,* 203 W. Va. 594, 509 S.E.2d 875 (1998). As the circuit court found, regardless of who committed the abuse, petitioner's conduct—at a minimum—constituted a failure to protect the child through appropriate supervision, which constitutes neglect. W. Va. Code § 49-1-201 (Defining "neglected child" as one "[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary . . . supervision"). On appeal, petitioner attempts to present the circuit court's consideration of his various explanations as punishment for trying to assist medical professionals, when, in actuality, the circuit court simply pointed out that petitioner never presented a plausible explanation for how the child suffered extensive, severe injuries. Petitioner also asserts that the circuit court erred in finding that his psychological evaluation found that he was at an increased risk for child abuse. Petitioner is correct that the evaluation did not reach this conclusion because the evaluator testified that petitioner's defensiveness rendered that portion of the assessment invalid. While the circuit court may have erred in making this isolated finding, such error does not entitle petitioner to relief on appeal. This limited finding, compared to the totality of the circuit court's comprehensive analysis of the evidence presented, does nothing to undermine the appropriateness of petitioner's adjudication.

We have previously held as follows:

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id.* at 546,

759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* at 546, 759 S.E.2d at 777 (citation omitted). As outlined above, the circuit court heard extensive evidence that the child was physically abused while in petitioner's care. Accordingly, we find no error in the circuit court's adjudication of petitioner below.

Next, petitioner argues that the circuit court erred in denying his motion for an improvement period and terminating his parental rights by again arguing that the circuit court inappropriately found that he failed to identify an abuser. As we concluded above, this argument does not entitle petitioner to relief, as the record shows that he did not take steps to actually make such an identification beyond suggesting that R.H. could have been the perpetrator. It is important to note that, much like at adjudication, the circuit court at disposition made extensive findings on this issue. In fact, the circuit court again noted petitioner's variance as to whether he believed R.H. committed the abuse and further noted that if she did, in fact, commit it, that her family went to great lengths to protect her over P.H.-1's best interests. Therefore, petitioner's reliance on this argument in support of this assignment of error entitles him to no relief.

Petitioner's remaining arguments can be resolved by his failure to acknowledge the conditions of abuse and neglect at issue. As this Court has held,

> [f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Here, the record shows that petitioner failed to make such acknowledgement. As the circuit court found, petitioner admitted that something happened to the child, but he failed to accept that the cause was abuse, even in the face of direct medical evidence that the child suffered nonaccidental trauma that resulted in multiple broken bones in various stages of healing. Given these extensive and severe injuries, it is obvious that something occurred, but petitioner's refusal to accept that the child was abused resulted in the underlying problem being untreatable. Since this renders an improvement period an exercise in futility, we find no error in the circuit court's denial of petitioner's motion for the same. Indeed, we have routinely held that "[t]he circuit court has the discretion to refuse to grant an improvement period when no improvement is likely." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

Petitioner's refusal to accept that P.H.-1 was abused also supports the circuit court's termination of his parental rights. As the circuit court found, petitioner's conduct resulted in there being no reasonable likelihood that he could substantially correct the conditions of neglect in the near future and made termination necessary for the child's welfare. Pursuant to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon these findings. Further, this Court has held that termination of parental rights

8

"may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, in part, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011).

On appeal, petitioner argues the circuit court should have granted him an improvement period to determine whether he could function with long-term assistance, especially since his psychological evaluation recommended services to aid him in his ability to remedy his parenting deficiencies. For support, petitioner relies on the following:

> "Where allegations of neglect are made against parents based on intellectual incapacity of such parent(s) and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance. In such case, however, the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement." Syllabus point 4, *In re Billy Joe M.*, 206 W.Va. 1, 521 S.E.2d 173 (1999).

Syl. Pt. 4, *In re Maranda T.*, 223 W. Va. 512, 678 S.E.2d 18 (2009).

Petitioner's argument ignores the fact that his refusal to acknowledge the truth of the basic allegations at issue—that P.H.-1 suffered nonaccidental, physical abuse—rendered him incapable of correcting them. Thus, even with long-term services, there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect. *See In re Timber M.*, 231 W. Va. at 55, 743 S.E.2d at 363 (stating that "failure to acknowledge . . . the truth of the basic allegation pertaining to the alleged abuse and neglect . . . results in making the problem untreatable"). As such, we find that the court made the proper determination quickly, in keeping with the direction above. Petitioner also argues that the circuit court failed to give appropriate weight to the fact that petitioner raised his two older children without incident. However, petitioner ignores the fact that the older children's mother reportedly quit her job to stay home with those children because of concerns regarding his ability to properly care for them. Therefore, we find that petitioner is entitled to no relief in regard to his assertion that the circuit court did not properly weigh this evidence.[5]

---

[5]In support of his assignment of error regarding the termination of his parental rights, petitioner asserts that the circuit court should have permitted more extensive contact between him and the older children following termination. However, petitioner cites to no authority governing post-termination visitation in abuse and neglect cases. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that

(continued . . . )

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 5, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: March 16, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

---

> [t]he brief must contain an argument exhibiting clearly the *points of* fact and *law presented,* the standard of review applicable, *and citing the authorities relied on* . . . [and] must contain appropriate and specific citations to the record on appeal . . . . The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

(Emphasis added). Additionally, in an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure, the Court specifically noted in paragraph two that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. Further, "[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented and do not 'contain appropriate and specific citations to the record on appeal . . .' as required by rule 10(c)(7)" are not in compliance with this Court's rules. Here, petitioner's brief in regard to this argument is inadequate, as it fails to comply with West Virginia Rule of Appellate Procedure 10(c)(7) and our December 10, 2012, administrative order. Accordingly, the Court will not address the argument on appeal.